## NEVADA-MASSACHUSETTS CO. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 9960.

Circuit Court of Appeals, Ninth Circuit.

May 19, 1942.

Adolphus E. Graupner and Louis Janin, both of San Francisco, Cal., for petitioner.

Samuel O. Clark, Jr., Asst. Atty. Gen., and J. Louis Monarch, Bernard Chertcoff, and Frederick E. Youngman, Sp. Assts. to the Atty. Gen., for respondent.

Before MATHEWS, HANEY, and STEPHENS, Circuit Judges.

STEPHENS, Circuit Judge.

This appeal is from a decision of the Board of Tax Appeals holding that the Petitioner, a Maine corporation with its principal business office in California, was liable for the surtax on undistributed profits for the years 1936 and 1937, as assessed by the Commissioner of Internal Revenue, respondent herein, in the amount of $22,752.16 for 1936 and $12,326.10 for 1937, under § 14 of the Revenue Act of 1936, c. 690, 49 Stat. 1648, 26 U.S.C.A. Int. Rev.Acts page 823. Petitioner claims a credit on the undistributed profits as provided in § 26(c) (2) of the Revenue Act of 1936, 26 U.S.C.A. Int.Rev.Acts p. 836, which provides:

"§ 26. Credits of Corporations.

"In the case of a corporation the following credits shall be allowed to the extent provided in the various sections imposing tax—

\*　　\*　　\*　　\*　　\*

"(c) Contracts Restricting Payment of Dividends.

\*　　\*　　\*　　\*　　\*

"(2) Disposition of profits of taxable year.

"An amount equal to the portion of the earnings and profits of the taxable year which is required (by a provision of a written contract executed by the corporation prior to May 1, 1936, which provision expressly deals with the disposition of earnings and profits of the taxable year) to be paid within the taxable year in discharge of a debt, or to be irrevocably set aside within the taxable year for the discharge of a debt; to the extent that such amount has been so paid or set aside. \*　\*　\*"

It is settled that the above section being one granting a deduction must be strictly construed, and that the taxpayer must be able to show that he comes within its terms, Helvering v. Northwest Steel

Mills, 311 U.S. 46, 61 S.Ct. 109, 85 L.Ed. 29; New Colonial Co. v. Helvering, 292 U.S. 435, 440, 54 S.Ct. 788, 78 L.Ed. 1348; White v. United States, 305 U.S. 281, 292, 59 S.Ct. 179, 83 L.Ed. 172. The facts on which petitioner relies are these:

Petitioner was organized by creditors of Pacific Tungsten Company, who held Pacific Tungsten's interest bearing notes, pursuant to an agreement executed by them on December 24, 1924, and amended by a supplemental agreement of February 16, 1925, which two agreements petitioner contends constitute the contract under which it claims the credit on the surtax. The agreement of December 24, 1924, recited that the notes, above referred to, were overdue and uncertain of payment and as action by one or more of the creditors might result in great loss, a new corporation should be formed by the parties with a capital stock of $100,000 divided into 100,000 shares. It further recited that "each of the parties hereto * * * shall assign * * * to said corporation the balance of the indebtedness owing to each respectively by the said Pacific Tungsten Company, and as evidenced by the said notes." In consideration of such transfer "the corporation" would issue stock to the parties and "make, execute and deliver to each of the parties * * * its promissory note for the unpaid amount of the promissory notes so assigned to said new corporation."

The agreement further provided:

"That said new corporation shall further agree that out of the net proceeds of the operation of the said mining property of the said Pacific Tungsten Company * * * and out of any other moneys which the said new corporation may have available for that purpose, it will pay to The First National Bank of Boston and The National Shawmut Bank of Boston together the sum of Five Thousand Dollars ($5000) and after such payment, it will pay one-half of such moneys to the First National Bank of Sonora, until said promissory notes so to be delivered to the said First National Bank of Sonora, with interest thereon, shall have been paid in full, and the remaining one-half of such moneys shall be applied prorata on account of payment of the respective notes held, as aforesaid, by each of the other parties hereto; and when the said notes held by said First National Bank of Sonora shall have been fully paid, thereafter such moneys shall be applied pro rata to the payment in full of the promissory notes of said new corporation, together with interest thereon, held by the other parties hereto * * *."

The effect of the agreement of February 16, 1925, was to incorporate into the agreement of December 24, 1942, certain notes of Pacific Tungsten which had been acquired by one Charles H. Segerstrom, one of the parties.

The two agreements were presented to petitioner's Board of Directors on February 18, 1925, and on motion it was voted that they "be and they hereby are, insofar as they may be applicable, accepted by this corporation as and for its undertaking with the parties thereto." The Directors then voted to purchase the outstanding notes of Pacific Tungsten from the parties to the agreement, as provided therein, and "to issue in consideration therefor" notes of petitioner, reciting various aggregate amounts payable to each of the parties, "said notes to be payable on demand and to bear interest at the rate of six per cent per annum", and to issue shares of the capital stock of the company to said parties in respective amounts as agreed.

Petitioner at a sheriff's sale in June, 1925, acquired the Pacific Tungsten assets and engaged in mining operations and milling. Its noteholders were assessed for advances equal to 15 per cent of the amount of their notes as provided in the contract, to provide working capital, and additional notes were executed to cover these advances. On April 1, 1929, petitioner issued renewal notes in exchange for the old notes, no payments having been made thereon. Segerstrom, one of the parties, had acquired Johnson's notes, and after the renewal he also acquired the notes of the First National Bank of Sonora. During 1931 and 1932 Segerstrom, because the Banks were not permitted to make further advances, voluntarily advanced $43,059.99 receiving interest bearing notes therefor. The creditors under the contract waived their respective priorities for repayment of their notes in favor of pro rata payment of the notes including those for advances. No formal separate agreement was executed as to these advances, but it was agreed that all these notes would be paid prior to any distribution of the funds of petitioner.

On July 12, 1934, renewal notes were again issued, covering the interest from April 1, 1929 to June 30, 1934, and the

directors voted to pay $2,000 monthly on an $18,000 note held by one of the parties, and $10,000 upon all of the other notes. Being unable to pay so much this resolution was rescinded.

During 1936 and 1937 the petitioner extracted tungsten ore from its land and milled it at its mill. It also worked leased mines at Mina, Nevada, on a royalty basis, but sustained losses from these operations and about 1937 abandoned its rights to title upon payment of specified royalties. The petitioner also worked the Humboldt property under a lease made in 1927, and acquired title to this property about 1933, after royalties which it had paid aggregated $75,000. In 1934 petitioner purchased all the shares of the Mill City Tungsten Mining Company which it had not previously acquired as part of the security held by the creditors of the Pacific Tungsten Company, paying $15,000 therefor. In 1936 petitioner expended $15,000 to replace a broken pipe line of the water system of the Mill City Development Company.

Petitioner maintained a special and general bank account with the First National Bank of Boston, and its receipts were deposited in the special account, transfers being made to the general account in such amounts and at such times as were judged by Segerstrom to be necessary for operating expenses. The petitioner had net taxable income in 1934 of $90,382.32; in 1935 of $183,090.02. The Commissioner determined an adjusted net income of $110,-986.21 for 1936 and $60,127.30 for 1937. The renewal notes of 1934 were satisfied by payments made from December 3, 1934, to October 25, 1937. Segerstrom, petitioner's President, determined the amounts to be paid on the notes and in so doing endeavored to pay as much as possible, leaving to the taxpayer the minimum balance he deemed necessary for operation. The notes were satisfied by proportionate payments made as set forth in the following table:

| | |
|---|---|
| Dec. 3, 1934 | $ 30,000.00 |
| June 20, 1935 | 150,000.00 |
| Dec. 23, 1935 | 100,000.00 |
| Jan. 29, 1936 | 67,455.43 |
| Apr. 1, 1936 | 25,000.00 |
| June 22, 1936 | 100,000.00 |
| Mar. 18, 1937 | 75,000.00 |
| Aug. 6, 1937 | 56,000.00 |
| Oct. 25, 1937 | 50,734.36 |

There is some dispute as to whether or not the record shows that there were any net proceeds prior to 1936. The Board states "there is no showing as to the net proceeds or other available moneys from year to year from 1925 to 1936 * * * it would appear that there had been earnings and profits in the past and that they were used otherwise than to pay the notes as the petitioner urges that the contract requires." 43 B.T.A. 1127. Petitioner urges that since it was forced to borrow sums from Segerstrom as late as 1932, and 1934 was the first year for which the government introduced evidence of any earnings and apparently a large deficit existed at the beginning of that year, and since the first salary payment to petitioner's President was made at the end of 1937 after the notes had been discharged, it is clear that petitioner had no earnings or profits and could make no payments on its indebtedness prior to 1934.

Turning now to the question of whether or not petitioner has demonstrated by these facts that it comes within the provisions of Section 26(c) (2) of the 1936 Revenue Act, we hold that under the strict construction required petitioner has not shown that it comes within the section, and there is no error in the decision of the Board.

The requirements for the applicability of this credit section are three: (1) There must exist a "written contract executed by the corporation prior to May 1, 1936". (2) This contract must contain a provision which "expressly deals with the disposition of earnings and profits of the taxable year". (3) The amount of earnings or profits claimed as a credit must be by the contract "required * * * to be paid within the taxable year in discharge of a debt, or to be irrevocably set aside within the taxable year for the discharge of a debt * * *".

Respondent contends that the two agreements by the incorporators, subsequently accepted and adopted by the resolution of the Directors of the corporation, and execution of the demand notes, do not constitute a "written contract executed by the corporation" under the first requirement. We do not find it necessary to decide this point, because assuming, without deciding, that it does constitute such a contract, we hold that it does not embody the second requirement, that is, that it does not "expressly deal with the disposition of earnings and profits of the taxable year".

It is contended by the Commissioner that the phrase in the statute "expressly

351

deal" should be taken to mean that the contract must literally, and in terms deal with the disposition of earnings and profits of the taxable year and in support thereof is cited the case of Helvering v. Moloney Electric Co., 8 Cir., 120 F.2d 617, at page 620, certiorari denied November 10, 1941, 314 U.S. 682, 62 S.Ct. 184, 86 L.Ed. ——, rehearing denied January 12, 1942, 62 S.Ct. 487, 86 L.Ed. ——. We do not agree that the Moloney case goes that far. We think that if the contract adequately, clearly and unqualifiedly provides for the earnings and profits of the taxable year to be paid or irrevocably set aside for such payment it comes within the expression "expressly deal" etc. In the Moloney case the contract provided that the "Company covenants that * * * it will pay * * * on the first day of June, 1930, and the first day of each succeeding June thereafter, so long as any of the debenture bonds hereby authorized are outstanding, a sum equal to 2% of the largest amount of debenture bonds at any time outstanding * * *". The Court said: "The legal obligation to pay to the trustees on June 1 of each year, 2 percent of the largest amount of bonds at any time outstanding was not conditioned upon the existence of earnings in in that year. It was a payment which was required to be made whether or not there were earnings in the taxable year. A contract which requires a payment irrespective of earnings and profits cannot be said to deal expressly with the disposition of earnings and profits of the taxable year." The Court there pointed out that the Board had found that the parties "intended" the profits should be applied toward such payments, and stated:

"First, even if the parties intended that the 2 percent payment should be made out of earnings and profits, this does not satisfy the statute which requires that the contract contain a provision which 'expressly deals with the disposition of earnings and profits of the taxable year'. The 'intent' found by the Board was certainly not stated expressly in the contract and therefore that contract does not come within the statute. * * *"

And we may add that the contract under consideration in the cited case does not purport to require the payment out of profits either by express provision or by any inference that can be drawn from the text of the contract. Neither in the Moloney case nor in the instant case, as we shall presently point out, is there any attempt to reform the contract so that it shall contain a provision "intended" but not included in it.

The agreement in the instant case recites "out of the net proceeds of the operation of the said mining property of the said Pacific Tungsten Company * * * and out of any other moneys which the said new corporation may have available * * * it will pay". Even if this could be construed to be an express dealing with the earnings and profits of the Pacific Tungsten Company, it could not be considered as an express dealing with earnings and profits of petitioner. The contract in mentioning profits refers only to profits accruing from the operation of properties of the corporation taken over by petitioner and petitioner it has been seen operated other properties. The accounts of the original Company and petitioner were not shown to have been kept separately.

It follows, of course, that if it cannot be said that the contract deals expressly with profits of taxpayer, it cannot be said that it deals with taxpayer's profits "of the taxable year".

Respondent has contended that as to point three the courts have held that the contract must "expressly" require the payment or the irrevocable setting aside of the profits within the taxable year in question, citing the Moloney case, supra, and Antietam Hotel Corp. v. Com'r, 4 Cir., 123 F.2d 274, 275. This question of "paying and irrevocably setting aside" the profits within the taxable year is very close to the question of "expressly dealing with * * * profits of the taxable year" one provision saying "expressly dealing" and the other "required". Our construction of each provision is the same, that is, that if a proper interpretation of the terms of the contract meets the requirement, then it is within the terms "expressly dealing" and "required". We do not think this is contra to the Antietam case, for there the contract provided payment by the corporation during the tax year, out of its "net current earnings for the preceding calendar year", and the court held this was not requiring payment within the taxable year. On its facts that case is distinguishable from our case. See also Commissioner v. Strong Mfg. Co., 6 Cir., 124 F.2d 360, at pages 363, 364. We have said that the agreement in the present case does not expressly deal

352

with disposition of profits of the taxable year, nor can we find that it provides for payment in the taxable year.

Affirmed.