**ARTIFICIAL ICE CO. v. GLENN, Collector of Internal Revenue.**
**No. 301.**

District Court, W. D. Kentucky,
at Louisville.

Feb. 24, 1943.

J. H. McMurtry and Claude Hudgins, both of Louisville, Ky., for plaintiff.

Samuel O. Clark, Jr., Asst. Atty. Gen., Andrew D. Sharpe and Edward First, Assts. to Atty. Gen., and Eli H. Brown, III, U. S. Atty., of Louisville, Ky., for defendant.

MILLER, District Judge.

The plaintiff, Artificial Ice Company, brought this action against the defendant, Collector of Internal Revenue for the District of Kentucky, to recover the sum of $1,733.91, being the amount paid by it under protest following a deficiency income tax assessment for the year 1937, alleged to have been erroneously assessed and illegally collected. In the computation of the surtax on undistributed profits the plaintiff claimed a credit for $12,765 which it contends was irrevocably set aside by it out of earnings in 1937 to pay a mortgage indebtedness maturing in 1938, as required by the mortgage indenture. The credit so claimed was disallowed by the Commissioner, as not complying with the requirements of Section 26(c)(2) of the Revenue Act of 1936, 26 U.S.C.A. Int.Rev.Acts, page 836.

The plaintiff, Artificial Ice Company, is a corporation existing under the laws of the State of Indiana, with its principal office in that State and with an office and place of business in Richmond, Kentucky. The defendant, Seldon R. Glenn, is, and was at the times herein referred to, a citizen of Kentucky and the duly appointed and acting Collector of Internal Revenue for the State of Kentucky.

On April 15, 1930, the plaintiff executed its first mortgage indenture to the Union Trust Company of South Bend, Indiana, to secure a loan of $100,000 evidenced by first mortgage bonds. The bonds were to mature in the principal amounts as follows:

| | |
|---|---|
| October 15, 1931 | $ 7,500.00 |
| October 15, 1932 | 7,500.00 |
| October 15, 1933 | 10,000.00 |
| October 15, 1934 | 11,000.00 |
| October 15, 1935 | 12,000.00 |
| October 15, 1936 | 13,000.00 |
| October 15, 1937 | 14,000.00 |
| October 15, 1938 | 25,000.00 |
| Total | $100,000.00 |

Paragraph 19 of the mortgage provided as follows: "19. Mortgagor agrees out of the profits of the company to establish every year during the life of this mortgage a sinking fund in a sufficient amount to take care of and pay the maturities falling due, both of principal and of interest, during the succeeding year and to preserve such sinking fund in a separate account in such manner and form as shall meet with the approval of the trustee. Mortgagor further agrees not to pay out of the profits or the surplus of the company dividends in an amount that would impair in any way or render impossible the accumulation and preservation of the sinking fund referred to above."

In 1930 the plaintiff purchased for sinking fund purposes $7,500 of local real estate bonds and $6,500 of its own bonds. In 1931 it retired $7,500 of the outstanding bonds by using the bonds already purchased and additional cash. In that same year it bought $6,000 of its own bonds and also $8,000 of United States Treasury Bonds at $7,973.75. In 1932 it retired $7,500 of the outstanding bonds by using the bonds which it had purchased and additional cash. No new purchases were made for the sinking fund for the years 1932 through 1937 inclusive, except that in 1934 it sold the United States Treasury Bonds and bought 80 shares of common stock of the DuPont Company with $7,859.51 of the proceeds. The local real estate bonds were held by the plaintiff in a safety deposit box at South Bend, Indiana, while the common stock of the Du Pont Company was held in a safety deposit box in Richmond, Kentucky. The plaintiff retired $15,000 of its bonds in 1933, $11,500 of its bonds in 1934, $12,000 of its bonds in 1935, $8,500 of its bonds in 1936 and $14,000 of its bonds in 1937. These retirements were by the payment of cash.

Accordingly, by December, 1937, the plaintiff had retired $76,000 of its bonds and held in its sinking fund the $7,500 local real estate bonds which had been purchased in 1930, and the common stock of the DuPont Company, which had been purchased in 1934. These securities had a market value at that time of $1,875 and $9,360 respectively, or a total of $11,235.

On December 4, 1937, the Board of Directors of the plaintiff company adopted the following resolution: "Whereas under the terms of the mortgage agreement entered into by and between the Artificial Ice Company and the Union Trust Company on the 15th day of April, 1930, the mortgagor, the Artificial Ice Company, agreed out of the profits of the company to establish every year during the life of this agreement a sinking fund of sufficient amount to take care of and pay the maturities falling due both of principal and all interest during the succeeding year, and to preserve such sinking fund in a separate account in such a manner and form as shall meet with the approval of the Trustee; and whereas the Artificial Ice Company only has funds available for said payment in the amount of $11,236.00, being local real estate bonds in distress worth approximately $1875.00; and 80 shares of Du Pont common stock worth at present market $9,360.00, leaving a deficiency in said sinking fund of $12,765.00, it is hereby ordered by the said Board of Directors that the Treasurer of the Artificial Ice Company set aside for the purpose of bringing up said mortgage sinking fund to the required sum of $24,000.00 out of the undistributed net earnings of 1937 the amount of $12,765.00, and place this amount in a special fund designated "Artificial Ice Company Mortgage Sinking Fund", and use this amount for the unpaid retirement of mortgage bonds due October 15, 1938, and for no other purpose." Thereafter three checks were drawn on the regular checking account of the taxpayer in South Bend, Indiana, and deposited in a new account at the State Bank and Trust Company at Richmond, Kentucky, which was opened and carried under the account name of "Artificial Ice Company Mortgage Sinking Fund." The three checks were drawn on the following dates and in the following amounts:

| December 13, 1937, | $5,000; |
| December 16, 1937, | $5,000; |
| December 31, 1937, | $2,765. |

The check of December 31, 1937, was mailed on that date and was deposited in the State Bank and Trust Company at Richmond, Kentucky, on the first day that the bank was open after the check reached Richmond.

During 1938 John B. Bayer, a director of the plaintiff company and also treasurer of the plaintiff company, since 1922, and working at the Richmond, Kentucky, office in 1937 and 1938, drew a number of checks on the State Bank and Trust Company at Richmond, Kentucky, which were signed "Artificial Ice Company, John B. Bayer." The only account which the plaintiff had at the State Bank and Trust Company was the "Artificial Ice Company Mortgage Sinking Fund" above referred to. The date, payee and amount of each check was as follows:

| | | |
|---|---|---|
| 2/1/38 | check to Richmond Ice Co. | $ 500.00 |
| 3/5/38 | check to Richmond Ice Co. | 500.00 |
| 3/7/38 | check to LaFayette Ice Co. | 6,000.00 |
| 3/10/38 | check to Richmond Ice Co. | 500.00 |
| 3/28/38 | check to Richmond Ice Co. | 500.00 |
| 4/18/38 | check to Artificial Ice Co. | 2,500.00 |
| 7/2/38 | check to Richmond Ice Co. | 500.00 |
| | Total | $11,000.00 |

These checks were honored and paid by the State Bank and Trust Company at Richmond, Kentucky, out of the account standing in the name of "Artificial Ice Company Mortgage Sinking Fund." The payment of these checks left a balance of $1,765 in this account. The foregoing checks were drawn and the amounts paid to the respective payees as loans at interest to companies affiliated with the plaintiff company. Over a period of years in the past it had been customary for the plaintiff company to borrow money from the bank during the winter and to lend it to the companies referred to. In 1938 instead of the plaintiff borrowing money from the bank to make such loans it was the idea of John B. Bayer, the treasurer, to use the funds on deposit in the mortgage sinking fund account which were not drawing any interest. In each instance the borrower gave to the plaintiff company an unsecured note bearing interest as evidence of the

loan. The notes were taken and held by Bayer as part of the sinking fund account and were kept for safe keeping in the safe at the company's office in Richmond, Kentucky. He had no specific instructions to use the funds in this way, it being his own idea of a good way to handle the loans usually made by the plaintiff company each winter to the affiliated companies referred to. The account in the State Bank and Trust Company at Richmond was under his control and he had authority to sign checks upon it.

The amounts so loaned were repaid to the plaintiff as follows:

| | | |
|---|---|---|
| 7/5/38 | Repayment by Artificial Ice Co. | $ 2,500.00 |
| 7/7/38 | Repayment by Richmond Ice Co. | 500.00 |
| 8/1/38 | Repayment by LaFayette Ice Co. | 6,000.00 |
| 8/5/38 | Repayment by Richmond Ice Co. | 500.00 |
| 8/8/38 | Repayment by Richmond Ice Co. | 500.00 |
| 8/9/38 | Repayment by Richmond Ice Co. | 500.00 |
| 8/10/38 | Repayment by Richmond Ice Co. | 500.00 |
| | Total amount of principal repaid | $11,000.00 |

In addition to the principal the repayments also carried interest. These amounts together with the interest were redeposited in the account of the Artificial Ice Company Mortgage Sinking Fund of the State Bank and Trust Company at Richmond. No record was made on the books of the plaintiff company at Richmond of the interest so received, but Bayer sent to the plaintiff company's home office in South Bend, Indiana, the amount of the interest as collected, advising the plaintiff company at the time where the interest came from. No criticism was received by Bayer from any officer of the plaintiff company of the foregoing transactions as handled by him.

On October 7, 1938, the balance in the mortgage sinking fund was $12,765, which was withdrawn in the form of a draft which was deposited in the plaintiff's regular bank account in South Bend, Indiana. The common stock of the Du Pont Company was sold by the plaintiff for $11,763.96 and also deposited in that account. On October 13, 1938, the plaintiff gave the successor trustee under the mortgage a check for $24,780, which amount was derived from the two deposits totalling $24,528.96 and from other current funds in the amount of $251.04.

The net income of the plaintiff for the year 1936 was $30,657.94. For that year dividends were declared and paid in the amount of $21,375. As of December 31, 1936, the earned surplus was $35,039.32. The net income of the plaintiff during 1937 was $38,746.12. During that year dividends were declared and paid in the amount of $21,375. As of December 31, 1937, the earned surplus of the Company was $48,845.27.

In its income tax return for the year 1937 the plaintiff claimed as a credit in computing the surtax on its undistributed net income the $1,275 which had been transferred from the company's general account in South Bend, Indiana, to the "Artificial Ice Company Mortgage Sinking Fund" account with the State Bank and Trust Company at Richmond, Kentucky. The Commissioner of Internal Revenue disallowed this credit and determined a deficiency assessment against the plaintiff which with interest amounted to $1,733.91. The plaintiff paid this amount under protest to the Collector of Internal Revenue on October 24, 1939. A claim for refund was thereafter timely filed and rejected by the Commissioner on November 30, 1940. The present action was filed on June 5, 1941 to recover this payment with interest.

For the purpose of determining the surtax on undistributed profits of corporations, Section 26(c)(2) of the Revenue Act of 1936 allows a credit to the taxpayer as follows:

"§ 26. Credits of Corporations.

"In the case of a corporation the following credits shall be allowed to the extent provided in the various sections imposing tax—

\* \* \* \* \*

"(c) Contracts Restricting Payment of Dividends.

"(1) \* \* \*

"(2) Disposition of profits of taxable year. An amount equal to the portion of the earnings and profits of the taxable year which is required (by a provision of a written contract executed by the corporation prior to May 1, 1936, which provision expressly deals with the disposition of earnings and profits of the taxable year) to be paid within the taxable year in discharge

of a debt, or to be irrevocably set aside within the taxable year for the discharge of a debt; to the extent that such amount has been so paid or set aside. For the purposes of this paragraph, a requirement to pay or set aside an amount equal to a percentage of earnings and profits shall be considered a requirement to pay or set aside such percentage of earnings and profits. As used in this paragraph, the word 'debt' does not include a debt incurred after April 30, 1936."

■ Whether and to what extent deductions for income tax purposes shall be allowed depends upon legislative grace; and only as there is clear provision therefor can any particular deduction be allowed. New Colonial Ice Co., Inc. v. Helvering, Commissioner, 292 U.S. 435, 440, 54 S.Ct. 788, 78 L.Ed. 1348; White v. United States, 305 U.S. 281, 292, 59 S.Ct. 179, 83 L.Ed. 172; Deputy v. Du Pont, 308 U.S. 488, 493, 60 S.Ct. 363, 84 L.Ed. 416.

■ The provisions in a federal taxing statute granting special tax exemptions are to be strictly construed. Helvering, Commissioner v. Ohio Leather Co., Nov. 9, 1942, 63 S.Ct. 103, 87 L.Ed. ——; Helvering, Commissioner, v. Northwest Steel Mills, 311 U.S. 46, 49, 61 S.Ct. 109, 85 L.Ed. 29; Antietam Hotel Corp. v. Commissioner, 4 Cir., 123 F.2d 274, 278; Nevada-Massachusetts Co. v. Commissioner, 9 Cir., 128 F.2d 347, 348.

■ In order for the credit under this section of the statute to be rightfully claimed, the following facts must exist:

(1) There must be a written contract executed by the corporation prior to May 1, 1936.

(2) This contract must contain a provision expressly dealing with the disposition of earnings and profits of the taxable year, and

(3) This contract must contain a provision requiring that a portion of such earnings and profits either (a) be paid within the taxable year in discharge of a debt or (b) be irrevocably set aside within the taxable year for the discharge of a debt.

Unless all three of these requirements are complied with the taxpayer is not entitled to the credit. Helvering, Commissioner v. Ohio Leather Co., Nov. 9, 1942, 63 S.Ct. 103, 87 L.Ed. ——; Nevada-Massachusetts Co. v. Commissioner, 9 Cir., 128

F.2d 347, 350; Antietam Hotel Corp. v. Commissioner, 4 Cir., 123 F.2d 274, 276.

■ The "earnings and profits" referred to in the statute must be earnings and profits of the taxable year in question. A provision which requires merely the payment or setting aside of fixed sums on fixed dates, without regard to the source of the funds so paid or set aside, does not deal expressly with the disposition of "earnings and profits of the taxable year" as required by the statute. Helvering, Commissioner, v. Moloney Electric Co. 8 Cir., 120 F.2d 617; C. C. Clark, Inc. v. United States, 5 Cir., 126 F.2d 292; Nevada-Massachusetts Co. v. Commissioner, 9 Cir., 128 F.2d 347; Clover Splint Coal Co., Inc., v. Commissioner, 3 Cir., 130 F.2d 52.

■ The provision in the mortgage indenture relied upon by the taxpayer does not meet this requirement. It merely requires that the mortgagor put aside every year sufficient funds "out of the profits of the company" to meet maturities in the following year. It is not restricted to profits "of the taxable year". The plaintiff itself so construed this provision and so acted under it. For the years 1932 through 1937 no purchases were made for the Sinking Fund. The funds used to pay off the bonds which matured in 1938 were to the extent of $11,763.96 put into the Sinking Fund in 1930 and 1931 by the purchase of local real estate bonds and U. S. Treasury Bonds, converted into Du Pont stock in 1934. Even considering the maturities falling due in 1938, the company's earnings in 1937 were 100% available for distribution by way of dividends since the earned surplus on December 31, 1936, was $35,-039.32, which was considerably more than was necessary to pay all of such maturities without taking into consideration the investments held in the Sinking Fund.

■ The transfer of the company's funds in the amount of $12,765 from a bank in South Bend, Indiana, to a bank in Richmond, Kentucky, did not constitute an irrevocable setting aside of these funds for the discharge of the mortgage indebtedness as required by the statute. The money still remained subject to the control of the company and could be disbursed on checks signed by a company officer. As a matter of fact, it was actually disbursed on such checks and paid out for purposes other than the discharge of the mortgage indebt-

edness. Whether this use by the Treasurer was contemplated or not, the fact remains that it was not "irrevocably set aside". Actually, the entire $12,765 was transferred back to the company's general checking account in the bank at South Bend, Indiana, on or about October 7, 1938, and remained there subject to check for five or six days before being paid to the Trustee for the bondholders. Helvering, Commissioner, v. Ohio Leather Co., Nov. 9, 1942, 63 S.Ct. 103, 87 L.Ed. ——; Antietam Hotel Corp. v. Commissioner, 4 Cir., 123 F.2d 274. The evidence fully justifies the conclusion that such temporary use of the funds by the Treasurer was either authorized or ratified by the company itself.

Since the express requirements of the *statute have not been met, the plaintiff is not entitled to* the credit claimed.