## HELVERING, COMMISSIONER OF INTERNAL REVENUE, *v.* OHIO LEATHER CO.*

No. 40.   Argued October 21, 1942.—Decided November 9, 1942.

---

*Together with No. 41, *Helvering, Commissioner of Internal Revenue,* v. *Strong Mfg. Co.,* and No. 42, *Helvering, Commissioner of Internal Revenue,* v. *Warren Tool Corp.,* also on writs of certiorari, 316 U. S. 651, to the Circuit Court of Appeals for the Sixth Circuit.

*Mr. Valentine Brookes* argued the cause, and *Solicitor General Fahy, Assistant Attorney General Clark,* and *Messrs. Sewall Key, Edward First,* and *Richard S. Salant* were on the brief, for petitioner.

*Mr. Donald J. Lynn* for the Ohio Leather Company; *Mr. Raymond S. Powers,* with whom *Mr. Arthur Morgan* was on the brief, for the Strong Manufacturing Company; and *Mr. Raymond T. Sawyer, Jr.,* with whom *Mr. Raymond T. Jackson* was on the brief, for the Warren Tool Corporation,—respondents.

Mr. Justice Murphy delivered the opinion of the Court.

The issue is whether respondents are entitled to certain claimed credits against their undistributed profits tax for the 1936 taxable year[1] by virtue of § 26 (c) (2) of the Revenue Act of 1936, 49 Stat. 1648.[2]

In each of these cases the taxpayer corporation contracted prior to May 1, 1936, by a written agreement, to apply a percentage of its net earnings of a particular calendar year to an indebtedness of the corporation; in each case the agreement expressly provided only that the payment of the specified percentage was to be made on or before a certain date—April 1 in the case of the Ohio Leather Company and Warren Tool Corporation, and April 15 in the case of the Strong Manufacturing Company—in the year following the calendar year during

---

[1] Taxpayer in No. 42 is also claiming a credit for the 1937 taxable year.

[2] Sec. 26. Credits of Corporations.

In the case of a corporation the following credits shall be allowed to the extent provided in the various sections imposing tax—

. . . . .

(c) *Contracts Restricting Payment of Dividends.*—

. . . . .

(2) *Disposition of Profits of Taxable Year.*—An amount equal to the portion of the earnings and profits of the taxable year which is required (by a provision of a written contract executed by the corporation prior to May 1, 1936, which provision expressly deals with the disposition of earnings and profits of the taxable year) to be paid within the taxable year in discharge of a debt, or to be irrevocably set aside within the taxable year for the discharge of a debt; to the extent that such amount has been so paid or set aside. For the purposes of this paragraph, a requirement to pay or set aside an amount equal to a percentage of earnings and profits shall be considered a requirement to pay or set aside such percentage of earnings and profits. As used in this paragraph, the word "debt" does not include a debt incurred after April 30, 1936.

which the net earnings arose.[3] However, the specified percentage was actually paid during the taxable year in each case. By reason of these contracts and payments, taxpayers have sought to avail themselves of the credit authorized by § 26 (c) (2), which relieves from the tax on undistributed profits, imposed by § 14 of the 1936 Act, any profits which may not be distributed because of a contract requiring that a portion of earnings of the taxable year be paid or irrevocably set aside within the taxable year for the discharge of a debt. The Commissioner of Internal Revenue determined that the credits claimed should not be allowed, and assessed deficiencies in each case. The Board of Tax Appeals overruled the Commis-

---

[3] The relevant contractual provisions in each case are as follows:

### No. 40

By an indenture entered into on April 17, 1936, the Ohio Leather Company covenanted to pay $25,000 annually to a trustee to create a sinking fund for the security of its debentures, and further covenanted that it would "on or before the next succeeding first day of April, pay an amount equal to ten percent (10%) of the net earnings earned by the Company during the fiscal year ending on the thirty-first day of the next preceding December, as such net earnings are defined hereinafter in the Article, which sums and amounts shall be held by the Trustee for the security of all outstanding Debentures until paid out as hereinafter provided."

### No. 41

By a note and mortgage agreement executed April 15, 1932, the Strong Manufacturing Company bound itself to apply forty per centum of its net earnings upon its unpaid obligation. The mortgage provided:

"The Company covenants and agrees that until the principal and interest of the note hereby secured shall have been fully paid and beginning on January 1st, One Thousand nine hundred thirty-four, the Company will apply forty per centum (40%) per annum of its net earnings for any calendar year in payment of the interest accruing and becoming payable upon such note in such year, and the balance of the principal amount of such note unpaid prior to April 15th in such year; provided, however, that the covenant herein made shall not be con-

sioner, and the Circuit Court of Appeals affirmed.[4] We granted certiorari because of an asserted conflict with *Antietam Hotel Corp.* v. *Commissioner,* 123 F. 2d 274.[5]

Since § 26 (c) (2) grants a special credit in the nature of a deduction, the taxpayer must sustain the burden of showing compliance with its exact terms. *Helvering* v. *Northwest Steel Mills,* 311 U. S. 46, 49.; *White* v. *United States,* 305 U. S. 281, 292; *New Colonial Ice Co.* v. *Helvering,* 292 U. S. 435, 440. We agree with the Commissioner that taxpayers have not carried that burden.

Section 26 (c) (2) expressly sets up three specific conditions precedent with which a corporation devoting part of its earnings to the payment of debts rather than the payment of dividends must comply before it is entitled to relief from the tax on undistributed profits—(1) there must be a written contract executed by the corporation

---

strued to relieve the Company from the payment on April 15th in such year of the installment specified for payment by the terms of said note nor of the regular interest payments in such year, likewise as specified in said note.

.        .        .        .        .

"Settlement for all amounts becoming payable under this provision in excess of the principal and interest payments absolutely required in the calendar year as of which such net earnings are determined shall be made by the Company to the Bank not later than April 15th of the succeeding year."

No. 42

On November 1, 1932, the Warren Tool Corporation executed a first mortgage and deed of trust to secure a bond issue. The mortgage contained a sinking fund provision which required the Corporation, on and after April 1, 1935, to pay to the trustee "on or before the 1st day of April of each year thereafter to and including April 1, 1942, a sum of money equal to Twenty-five 'Per Cent (25%) of its net earnings for the calendar year next preceding."

[4] An opinion was written only in *Commissioner* v. *Strong Mfg. Co.,* 124 F. 2d 360. The other two cases were per curiam affirmances on the authority of that opinion. 124 F. 2d 397.

[5] Compare *Helvering* v. *Moloney Electric Co.,* 120 F. 2d 617, 621.

prior to May 1, 1936; (2) this contract must contain a provision expressly dealing with the disposition of earnings and profits of the taxable year; and (3) this contract must contain a provision requiring that a portion of such earnings and profits either (a) "be paid within the taxable year in discharge of a debt," or (b) "be irrevocably set aside within the taxable year for the discharge of a debt." A taxpayer whose contract satisfies each of these three requirements is entitled to a credit to the extent of the amount which has been so paid or irrevocably set aside.

While taxpayers have met the first two statutory requirements—the written contracts antedate May 1, 1936, and contain provisions expressly dealing with the disposition of earnings for the taxable year—, they have not met the third one.[6] The contracts clearly contain no provision requiring the payment of earnings "within the taxable year in discharge of a debt." Nor do they, contrary to taxpayers' assertion, require the irrevocable setting aside of earnings "within the taxable year for the discharge of a debt," within the meaning of § 26 (c) (2). The contracts are wholly silent in respect of any setting aside; they do not in terms require taxpayers to set aside the amount due, nor do they direct any segregation or physical retention whatsoever. The only requirement is that taxpayers pay on or before a date *after* the close of the taxable year. This is not enough. Until that date taxpayers were free to use the specified percentages as they pleased, so far as the agreements were concerned. That prudent business judgment, or the possibility of fiduciary liability imposed by operation of law might have con-

---

[6] This holding makes it unnecessary to consider the Commissioner's contention that the Strong Manufacturing Company did not meet the second requirement as to $5,000 of the $46,500 paid in 1936, because it was obligated to pay that sum by April 15, 1937, even in the event that there were no earnings in 1936.

strained taxpayers to refrain from using these percentages and actually to set them aside is immaterial; such setting aside was not required by the terms of the written contracts, and therefore did not satisfy § 26 (c) (2). Cf. *Helvering* v. *Northwest Steel Mills*, 311 U. S. 46, 52. Likewise, the fact that taxpayers actually irrevocably set the funds aside by anticipatory payments within the taxable year is of no moment, because these payments were voluntary and not pursuant to the command of the agreements.

That Congress did not intend that the statutory condition of an irrevocable setting aside would be satisfied by a contract which, without more, merely requires that a percentage of earnings of the taxable year be paid in some future year for the discharge of a debt, is evident, because such a construction reduces the alternative condition of § 26 (c) (2), relating to actual payment within the taxable year, to a meaningless superfluity. The date specified for payment would become immaterial for all purposes if the mere requirement by contract of future payment out of earnings in a given year automatically entails an "irrevocable setting aside" within that year.

Taxpayers here place great emphasis upon the different prepositions used in the alternative phrases—"to be paid within the taxable year *in* discharge of a debt, or to be irrevocably set aside within the taxable year *for* the discharge of a debt"—to show that payment may be made after the taxable year compatibly with § 26 (c) (2). True enough, payment can be postponed to a future year and a credit allowed if, but only if, the contract directing such future payments requires, in terms, the irrevocable setting aside within the taxable year of those future payments. The instant contracts do not so provide.

Respondents, the Ohio Leather Company and Warren Tool Corporation, contend that because they were on an accrual basis of accounting, they were entitled to the

credit by virtue of § 43,[7] which states that it is to be disregarded in computing the credit provided by § 27 and makes no statement with regard to § 26. The contention is without merit because principles of accrual accounting have no bearing on the question of whether a contract in terms requires a payment or an irrevocable setting aside within the taxable year. The question here is not whether taxpayers made payment, either on a cash or an accrual basis, within the taxable year, but whether their contracts required them to pay or irrevocably set aside within the taxable year.

Taxpayers insist that it would be unreasonable to hold that only contracts expressly requiring payment or an irrevocable setting aside of a percentage of earnings within the taxable year satisfy § 26 (c) (2), because many corporations are unable to determine their earnings until after the close of their fiscal year, and consequently their contracts disposing of a percentage of earnings in satisfaction of debt customarily allow some short period after the close of the year, before payment is required. The legislative history of the 1936 Act reveals that Congress was conversant with the problem of computing earnings before the end of the taxable year, in connection with dividend payments, but declined to act.[8] Corporations

---

[7] "Sec. 43. Period for Which Deductions and Credits Taken.

"The deductions and credits (other than the dividends paid credit provided in section 27) provided for in this title shall be taken for the taxable year in which 'paid or accrued' or 'paid or incurred,' dependent upon the method of accounting upon the basis of which the net income is computed, . . ."

[8] The original House bill (H. R. 12395, 74th Cong., 2d Sess., introduced at 80 Cong. Rec. 5978) provided for the use of the "dividend year" in computing undistributed net income under § 13 and dividend credit under § 15. Section 27 defined "dividend year" as the period beginning on the 15th day of the third month after the day before the beginning of the taxable year, and ending on the 14th day of the third month after the close of the taxable year. Thus, where the calendar

with oral contracts, or written contracts executed after May 1, 1936, dealing with the disposition of profits in satisfaction of debts, also probably think § 26 (c) (2) is a most unreasonable statute. But arguments urging the broadening of a tax deduction statute beyond its plain meaning to avoid harsh results are more properly addressed to Congress than to the courts. *White* v. *United States,* 305 U. S. 281, 292.[9]

Finally, taxpayers contend that the legislative history of § 26 (c) (2) supports the view that their contracts are covered by that section. An examination of the entire legislative background of the undistributed profits tax demonstrates, contrary to taxpayers' contentions, that Congress intended the tax to be imposed primarily upon income not distributed in the form of dividends, rather than only upon corporate income which was not distributed at all, and accordingly meant to limit severely credits for a corporation's payment of debts and precisely to define the area in which taxpayers were to be entitled to the credit. Thus, while the original House bill contained complicated provisions affording some relief to corporations with deficits, or contractually obligated either to pay debts or not to pay dividends, the Senate Finance

---

year and the taxable year coincided, the "dividend year" would cover the period from March 15 of the taxable year to March 14 of the following year. Congressman Hill, chairman of the subcommittee of the House Ways and Means Committee, explained that the "dividend year" was designed to allow corporations time to cast up their accounts after the close of the taxable year and then determine what dividends should be distributed. 80 Cong. Rec. 6005. Nevertheless, Congressman Hill later offered, and the House adopted, a committee amendment substituting the "taxable year" for the "dividend year." 80 Cong. Rec. 6308. See also 80 Cong. Rec. 10265.

[9] Appeals to Congress because of the limited scope of § 26 (c) (2) were successful in 1938. Section 27 (a) (4) of the Revenue Act of 1938 allows a credit without reference to the particular terms or requirements of the indebtedness. See H. Rep. No. 1860, 75th Cong., 3d Sess., p. 4.

Committee struck them all out, substituting only a provision dealing with a credit for contractual prohibitions against the payment of dividends.[10] An amendment offered from the Senate floor, giving a broad credit for all portions of adjusted net income used to purchase or replace machinery, equipment, etc., or "expended or applied during the taxable year for the liquidation, payment, or reduction of the principal of any bona-fide indebtedness outstanding at the date of enactment of this Act," was rejected.[11] The much narrower amendment which became § 26 (c) (2) was then offered, with little explanation other than that it was intended to supplement the credit for contractual prohibition against dividend payments, the provision which became § 26 (c) (1).[12]

We conclude that the judgments below were erroneous. Accordingly they are reversed, and the causes remanded with directions to uphold the determination of the Commissioner.

*Reversed.*

---

[10] This legislative history is discussed in *Helvering* v. *Northwest Steel Mills*, 311 U. S. 46, 50.

[11] 80 Cong. Rec. 9055, 9070, 74th Cong., 2d Sess,

