*Decision will be entered under Rule 50.*

---

NORTHWESTERN STEEL AND WIRE COMPANY (FORMERLY NORTHWESTERN BARB WIRE COMPANY), PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 107181. Promulgated May 18, 1943.

*E. H. McDermott, Esq., Wm. M. Emery, Esq.*, and *Richard E. Steinbrecher, Esq.*, for the petitioner.

*F F. Korrell, Esq.*, for the respondent.

1118

## OPINION.

DISNEY, *Judge:* The principal contention for our determination here is whether the petitioner is entitled to a credit on account of a contract restricting payment of dividends under the provisions of section 26 (c) (1), Revenue Act of 1936.[1] The petitioner relies upon, as

[1] [We set forth here not only section 26 (c) (1), but section 26 (c) (2), hereinafter to be considered.]

SEC. 26. CREDITS OF CORPORATIONS.

In the case of a corporation the following credits shall be allowed to the extent provided in the various sections imposing tax—

\*      \*      \*      \*      \*      \*      \*

(c) CONTRACTS RESTRICTING PAYMENT OF DIVIDENDS.—

(1) PROHIBITION ON PAYMENT OF DIVIDENDS.—An amount equal to the excess of the adjusted net income over the aggregate of the amounts which can be distributed within the taxable year as dividends without violating a provision of a written contract executed by the corporation prior to May 1, 1936, which provision expressly deals with the payment of dividends. If a corporation would be entitled to a credit under this paragraph because of a contract provision and also to one or more credits because of other contract provisions, only the largest of such credits shall be allowed, and for such purpose if two or more credits are equal in amount only one shall be taken into account.

(2) DISPOSITION OF PROFITS OF TAXABLE YEAR.—An amount equal to the portion of the earnings and profits of the taxable year which is required (by a provision of a written contract executed by the corporation prior to May 1, 1936, which provision expressly deals with the disposition of earnings and profits of the taxable year) to be paid within the taxable year in discharge of a debt, or to be irrevocably set aside within the taxable year for the discharge of a debt; to the extent that such amount has been so paid or set aside. For the purposes of this paragraph, a requirement to pay or set aside an amount equal to a percentage of earnings and profits shall be considered a requirement to pay or set aside such percentage of earnings and profits. As used in this paragraph, the word "debt" does not include a debt incurred after April 30, 1936.

one contract, the provisions of a trust indenture and a stock purchase warrant agreement. In substance, the trust indenture provided that the petitioner would not declare or pay any dividends "(other than stock dividends) on any of the common stock of the company" except out of earnings from operations subsequent to July 31, 1935, and then not if after payment of such dividends the net current assets of the company shall be less than $901,474.74, computed in accordance with standard accounting practice. The stock purchase warrant agreement in effect provided that in case the company should determine to declare any stock dividend upon outstanding common stock, or to make any distribution to any common stockholders, other than cash dividends, or to offer for subscription to common stockholders any additional stock, the company should give the trustee and the holders of the stock purchase warrants previous notice of the date to the end that the holders of stock purchase warrants might purchase stock in accordance with their warrants and be entitled, in respect of the stock so purchased, to receive such stock dividend or other distribution; also, that so long as stock purchase warrants were outstanding, common stock would not be issued except out of presently authorized common stock and/or any lawful increase thereof, that stock would not be issued with a preference over, or participating with, common stock, except that preferred stock might be issued out of presently authorized issue and/or increase thereof, or out of a new issue, provided that 80 percent of liquidation value be received for such preferred stock, that dividends thereon be limited to 8 percent, and that it carry no greater voting right than common stock. The petitioner contends, in substance, that at no time during the taxable year did the net current assets of the company exceed $901,474.74, and that in fact they were much less, and that therefore it could not declare or pay a dividend and is entitled to the credit under section 26 (c) (1). Included among the assets of petitioner was a note from its president in the amount of $280,000, and whether the net current assets during the taxable year exceeded $901,474.74 depends upon whether said note is to be considered among net current assets under standard rules of accounting. The respondent upon brief conceded some merit in the petitioner's position that the note was not so to be included among net current assets and states that he does not press the argument to the contrary further than merely to point out that the respondent's determination is presumptively correct and that there is some conflict in the testimony on the point. Considering such view, together with the fact that the $280,000 indebtedness was in existence prior to July 1, 1935, but as of that date was not included in computation of current assets covered by article III, section 12, of the trust indenture, and the conclusion to which we have come in this proceed-

ing, we assume, without deciding, that the $280,000 was not a current asset within the meaning of that section. Therefore during the current year the petitioner was subject to a contract restricting it from paying dividends "other than stock dividends" upon common stock.

This does not, however, dispose of the entire question, for the respondent points out that stock dividends could have been paid and quotes our language in *Budd Wheel Co.*, 45 B. T. A. 963 (969), in effect approving his contention that a restriction upon payment of cash dividends did not restrict payment of stock dividends. To the same effect is *Commissioner* v. *Columbia River Paper Mills*, 127 Fed. (2d) 558, reversing 43 B. T. A. 263, upon which the petitioner relies. We followed the decision of the Circuit Court of Appeals in *Oregon Pulp & Paper Co.*, 47 B. T. A. 772.

The petitioner contends, however, that stock dividends could not, under the circumstances here, be paid for the reason that the only possibility was of stock distributions in common stock upon common stock, that such would not constitute a taxable dividend, that a nontaxable dividend would not affect the question, and that the small quantity of preferred stock authorized, but unissued, could not be issued as a stock dividend because it could only be issued for a consideration equal to 80 percent of its liquidation value; that for all such reasons no taxable stock dividend could be issued; that, therefore, the petitioner is entitled to the credit here involved.

To that contention the respondent answers, in part, that the stock purchase warrant agreement was a separate contract from that of the trust indenture relative to restrictions upon payment of dividends, that although the bonds to be issued under the trust agreement and the stock purchase warrants were issued in units, they could as such units be divided and therefore can not be looked at as issued under one indivisible contract; and particularly that even under the language of the stock purchase warrant agreement there was no restriction upon issuance of stock dividends, but rather a recognition that stock dividends could be issued, since it was therein provided that in case the company should determine to declare a stock dividend upon any of its outstanding common stock or to make any distribution to common stockholders other than cash dividend, the holders of the stock purchase warrants should have notice so that they could purchase stock in accordance with their warrants and participate in such dividend or distribution; but that in any event the petitioner is in error in contending that the stock purchase warrants outstanding were sufficient to take up, and therefore restricted, all the common stock, for the reason that the stock purchase warrant agreement provided that the term common stock means the present common stock "and any lawful increase thereof" and that it was specifically pro-

vided, not as the petitioner contends, that the company would not issue common stock as long as stock purchase warrants were outstanding, but that so long as the warrants were outstanding "the company will not issue any common stock except out of its present authorized issue of common stock and/or any lawful increase thereof," and that, therefore, since the company was free to increase its common stock, it was free to issue stock dividends out of such lawfully increased capital stock; also that petitioner was not prevented from increasing its authorized preferred stock and that the requirement that preferred stock could not be issued for a consideration less than 80 percent of liquidation did not prevent issuance thereof as a stock dividend.

The statute here under consideration must be strictly construed, since it provides for a credit. *Helvering* v. *Northwest Steel Rolling Mills*, 311 U. S. 46; *Helvering* v. *Ohio Leather Co.*, 317 U. S. 102. The petitioner, faced with the fact that section 12 of the bond indenture permits stock dividends on either common stock or preferred stock, is in the position of attempting to incorporate into such contract the provisions of the contract with reference to stock purchase warrants, which contain language relied upon to prohibit issuance of stock, therefore, the petitioner contends, preventing stock dividends. The bond indenture was a contract with the holders thereof; the stock purchase agreement was one with the purchasers of bonds, who also received warrants entitling them to purchase 25,000 shares of stock; also, with others not holding bonds, but holding certificates entitling them to purchase 15,000 shares of stock. "Generally, several instruments executed at the same time and relating to the same subject-matter can not be construed together as one contract unless they are between the same parties." *Lunt* v. *Van Dorgen*, 278 N. W. 631; 13 C. J. 530. In *Positype Corporation* v. *Mahin*, 32 Fed. (2d) 202, there was involved an attempt to connect two contracts as one as a defense to a suit for failure to purchase corporate stock as agreed. One contract, the contract signed by the defendant, was an "Underwriting Syndicate Agreement" under which he could purchase preferred stock at $100 a share, including two shares of common stock. This syndicate agreement was referred to in an agreement to incorporate the corporation, the stock of which the defendant agreed to purchase, and certain statements in the agreement to incorporate were relied upon as a defense on the theory that the two agreements were upon the same subject matter and should be construed together. The parties to the agreement to incorporate appear to have been different from those signing the syndicate agreement. The court held that the contracts were separate and in the course of the opinion said:

* * * Several instruments between the same parties, executed at the same time, and dealing with the same subject-matter, are read as one; but the absence of one or more of such elements of identity may make clear that the

instruments are independent of each other. For instance where the parties to the instrument are different, they do not constitute one agreement (Pittsburgh, C. & St. L. R. Co. v. Keokuk & H. Bridge Co., 131 U. S. 371, 9 S. Ct. 770, 33 L. Ed. 157; Pittsburgh, C. & St. L. R. Co. v. Keokuk & H. Bridge, 155 U. S. 156, 15 S. Ct. 42, 39 L. Ed. 106). * * *

17 Corpus Juris Secundum § 58, p. 408, says:

An agreement may be collected from several different writings which, when connected, show the parties, subject matter, terms, and consideration, as in the case of contracts entered into by correspondence, considered in § 52 supra, but the rule, that where a written contract is in several parts and all are executed at the same time it is but one contract, cannot be applied to separate and distinct papers executed and signed by different parties and imposing different obligations on the parties executing them. * * *

We do not think that the two contracts here should be read as one, for the purpose of the statute here being considered. That statute requires, for the credit claimed by the petitioner, that the petitioner be prohibited from payment of dividends by a provision of a written contract expressly dealing with the payment of dividends. The contract with reference to stock purchase certificates contains no express provision restricting the payment of dividends. Section 9 of article IV provides against issuance of common stock except out of "present authorized issue * * * and/or any lawful increase thereof." Other language thereof, though contradictory of itself, permits issuance of preferred stock, particularly if certain conditions are observed. Section 4 of the same article provides merely for thirty days notice to holders of stock purchase warrants before declaration of any stock dividend upon *common* stock "to the end that * * * the holders * * * may purchase stock * * * or * * * receive such dividend * * *." All this adds nothing in that respect to the contract necessarily primarily relied upon by the petitioner, that is, the language of the bond indenture, which, as already seen, does not prohibit stock dividends. The stock purchase agreement was made by the petitioner with a different purpose from that in the issuance of bonds, and in a very large measure with different people, for, out of the 40,000 shares of stock which could be purchased under the stock purchase agreement, certificates entitling the holders to purchase 15,000 shares were not purchased by the purchasers of bonds, but the purchase warrants of the bonds were kept by the underwriters as their fee and could be sold to anyone.

In addition, the record does not indicate that the stock purchase agreements were not assignable separately from the bonds. It thus appears that there is no real connection between the bonds and the purchase of the stock, except the mere fact that originally a purchaser of bonds received a sort of bonus, a stock purchase privilege, or, more accurately, purchased such a privilege together with the purchase of

his bond. The record does not disclose whether such stock certificates in the taxable year are still in the hands of the holders of the bonds. Though in fact the stock purchase rights were still extant in the taxable year, yet they might have been at an end, exercised and merged into stock ownership, prior thereto; while the rights of the bondholders, of course, would remain alive and effective so long as the bonds were outstanding. The purpose of the restriction upon payment of dividends was obviously for the benefit of the bondholders and their security, and of no interest to the holders of stock purchase warrants. Of course as potential stockholders, they would hold subject to the bonds. The rights of holders of the stock purchase warrants, on the other hand, were for their protection and of no interest to the holders of the bonds, whose rights were superior to those of stockholders. The bond indenture does not refer to the stock purchase agreement, and the stock purchase agreement refers only to the fact of issuance of $1,250,000 bonds being issued under the bond trust indenture and that the stock purchase warrants were to be issued "in order better to enable the Company to market and sell said bonds." In other words, the only connection between stock purchase warrants and bonds was that the stock purchase agreement served to stimulate the sale of the bonds. They were separate contracts, separately issued. Only in so far as warrants authorizing purchase of 25,000 shares (out of the warrants for 40,000 shares) were sold with the bonds, and only during such sale, were the bonds and stock purchase warrants treated together.

From all of these considerations of the reason for, and specific requirements of the statute, and the difference in character of the two agreements, we hold that the stock purchase agreement should not be considered as a part of the contract restricting dividends.

However, even if the two contracts are read together and considered as one, in our opinion the provisions of section 26 (c) (1) are still not satisfied nor the credit allowable. That statute provides, in most particular terms, that to obtain the credit, the taxpayer must point, not merely to a contract, but to a *provision* of a contract, and a provision *expressly* dealing with the *payment of dividends*. Moreover, the provision must prohibit payment of dividends, for the statute provides that the credit is given only if the provision is *violated*. The reason is plain: Congress allowed the credit for a dividend paid; and it permitted use of a substitute for payment, in the form of an express contractual provision prohibiting payment. But such substitute must be gathered, not from inference, not from general contractual expression, but from a written provision express, and express upon the subject of dividend payments. Nothing less, we think, was intended to be substituted for payment of a dividend. The burden of showing that the corporation could not pay dividends was intentionally made heavy and exacting.

Here, the only provision in the bond indenture *expressly* dealing with payment of dividends does not preclude stock dividends. Petitioner would, therefore, import a provision from elsewhere. However, even when so imported, it does not expressly and prohibitively deal with payment of dividends. Section 9 of article IV, above referred to, nowhere mentions dividends. It deals with stock issues, but even there, when taken altogether, is found to permit issuance of both common and preferred stock. Section 4 of article IV does expressly mention stock dividends, but upon *common* stock only, and contains no prohibition of issuance of stock dividends, but only provides for notice to holders of stock warrants prior to declaration of dividends. Obviously this constitutes nothing preventing petitioner from issuing stock dividends even upon common stock, and it leaves the issuance of dividends on preferred stock entirely free. It is to be noted also, that the section shows the expectation that stock dividends could be issued. We think it was not Congressional intent that the credit be based upon a provision so devoid of the element of express dealing with prevention of payment of dividends. Indeed, since the language from the stock purchase warrant agreement is found, after all, to permit issuance of stock, either common or preferred, in the taxable year, it is to be seen that the petitioner, in relying upon the cases for its thesis that a *taxable* distribution of a stock dividend could not be made, is thus relying, not even upon the language imported from the stock purchase agreement, but upon general law (as to taxable or nontaxable dividends) affecting stock dividends. Such position is far removed from the necessary express restrictive provision dealing, not only with dividends, but their payment.

In addition, we are of the opinion that the provisions of the stock purchase agreement do not so affect the prohibition on issuance of stock as to give the effect for which the petitioner contends; for it is there provided that the company may issue preferred stock either out of its present authorized preferred stock or any lawful increase thereof, or may create and issue new preferred stock, upon certain conditions which, so far as pertinent here, are that the consideration received therefor shall not be less than 80 percent of liquidation value. If stock could have been issued during the taxable year, under this provision it is plain that so far as the record here shows such stock so issued might have constituted a taxable dividend, for such stock might have been issued as dividends upon both common and preferred stock or upon either, thus effecting a difference in proportional interests in the corporation. *Helvering* v. *Sprouse; Strassburger* v. *Commissioner*, 318 U. S. 604. Therefore petitioner's further argument, that a common stock dividend upon common stock would not be taxable, would be rendered immaterial. The petitioner's answer

to this contention is, in effect, that a stock dividend upon the preferred stock could not have been issued because a consideration of 80 percent of liquidation value must be received therefor; and, further, that the Illinois corporation law provides that no dividend payable in shares shall be paid in shares having a privilege as to dividends over the shares upon which such dividend is paid, unless the payment is authorized by the articles of incorporation, and that petitioner's preferred stock was preferred as to dividends over its common and such payment of dividends was not authorized by petitioner's articles of incorporation.

We can not agree with these contentions. We fail to discern that the issuance of a stock dividend precludes the idea that it is issued for a consideration. For example, had a stock dividend in preferred upon the preferred stock been issued, as provided by section 9 of article IV of the stock purchase warrant agreement, it is entirely possible that more than 80 percent of its liquidation value might have been transferred from the earned surplus account to the capital stock account. In our opinion, this would constitute consideration for the preferred stock dividend. It would be the same, in effect, as if the earned surplus had been distributed to the stockholder and had been paid for the preferred stock issued. We hold that the provision as to the 80 percent consideration does not preclude a stock dividend. Nor do we think that the provision of the Illinois law can be given the effect desired. The state statute can not serve as contract. *Helvering* v. *Northwest Steel Rolling Mills, supra.* Moreover, in substance, it merely provides that the articles of incorporation govern as to dividends paid in shares having a preference as to dividends over the shares upon which paid. The articles of incorporation are thus seen to be relied upon as assisting to constitute a contract within the meaning of section 26 (c) (1). Such articles do not form a part of the contract contemplated by the statute. *Commissioner* v. *Columbia River Paper Mills*, 127 Fed. (2d) 558; *Metal Specialties Co.*, 43 B. T. A. 891; *Lehigh Structural Steel Co.*, 44 B. T. A. 422. Moreover, the articles of incorporation were subject to change. We find nothing in such statutory provision nor in the 80 percent consideration requirement for preferred stock which constitutes an agreement within the intendment of section 26 (c) (1) entered into prior to May 1, 1936, effective to prevent the issuance of stock dividends during the taxable year.

After careful consideration of the conflicting views of parties upon this whole question, we conclude and hold that no contract entered into prior to May 1, 1936, restricted the payment of taxable stock dividends by the petitioner during the taxable year, and that therefore the credit desired was properly disallowed under the provisions of section 26 (c) (1).

In the alternative, the petitioner argues that it is entitled to credit under section 26 (c) (2), Revenue Act of 1936, in the amount of $74,927.96. That section grants credit when the contract *requires* either payment, or irrevocable setting aside, within the taxable year, of earnings and profits of such taxable year. No contention is made that payment was made within the taxable year, since in fact the taxable year ended on July 31, 1937, and the payment was made on October 30, 1937. Dependence is placed on irrevocable setting aside within the taxable year. The provision of the trust indenture was, so far as here concerned, that the petitioner covenanted to pay to the trustee on November 1, 1937, "as a sinking fund a sum of money equal to twenty per cent of the 'sinking fund earnings,' as hereinafter defined, for the twelve calendar months ending on the next preceding July 31st, as disclosed by the annual audit to be filed with the Trustee" (on or before the first day of November, showing financial condition as of July 31st next preceding). Considering the conclusion to which we have come upon this point, we assume (without so deciding) that "sinking fund earnings" as defined in the trust agreement, constitute "earnings and profits" within the language of section 26 (c) (2). The respondent argues that no irrevocable setting aside within the taxable year was required, within the ambit of section 26 (c) (2), and relies largely upon *Helvering* v. *Moloney Electric Co.*, 120 Fed. (2d) 617, while the petitioner views that case as distinguishable and in the main points to *Commissioner* v. *Strong Manufacturing Co.*, 124 Fed. (2d) 360. In our opinion, there was not the necessary irrevocable setting aside within the taxable year, and the *Moloney Electric Co.* case is in point. There, very much as herein, payment was required, after the taxable year, of 20 percent of net earnings for the next preceding year (in excess of a certain amount). The court held that no irrevocable setting aside was required to be made in the taxable year, or earlier than April 1 of the succeeding year (the latest date for filing the audit, at which time the amount was required to be set aside in a separate fund). Similarly, in the instant case, the audit was not required to be filed with the trustee until November 1, following the close of the taxable year; and nothing is said as to when the 20 percent shall be set aside. We find nothing in the *Moloney Electric Co.* case to indicate that the court did not clearly deny the credit because of failure to show irrevocable setting aside within the taxable year, and we think that situation is equally present here. The distinguishing elements which the petitioner finds in that opinion are particularly labeled a reason additional to the grounds of decision applied therein and by us herein. Moreover, *Commissioner* v. *Strong Manufacturing Co.*, *supra*, was reversed by the Supreme Court in *Helvering* v. *Strong Manufacturing Co.*, 317 U. S. 102, and it was there held

that the taxpayer was not entitled to the credit provided under section 26 (c) (2) of the Revenue Act of 1936, where, although payment of a percentage of net earnings upon indebtedness was actually made within the taxable year, there was no contract requiring it to be made until a later year. We likewise herein find no such requirement of payment or setting aside of earnings, within the taxable year. The petitioner was merely obligated to pay, after the taxable year, an amount to be determined according to facts not earlier determined (the amount of "sinking fund profits"), and the creditor could not, merely relying upon the trust provision or contract, during or at the end of the taxable year, have sustained an equitable right to have the amount frozen in the hands of the petitioner, which could very conceivably have earned, after July 31 and before November 1, amounts sufficient to meet the payment. Moreover, the petitioner herein had the option of paying cash into the sinking fund or turning in its own bonds for cancellation and receiving credit therefor in connection with the amount payable into the sinking fund. We held in *Fox River Paper Co.*, 44 B. T. A. 986, under facts essentially the same as those here involved in this respect, that petitioner was not entitled to credit under section 26 (c) (2). We conclude and hold that petitioner is not entitled to credit under section 26 (c) (2), Revenue Act of 1936. We find no error in denial of the credits claimed under either subdivision of section 26 (c).

*Decision will be entered for the respondent.*