THE COLUMBIA CONSERVE COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 104257. Promulgated July 16, 1943.

*Bruce H. Johnson, Esq.,* and *Frank C. Olive, Esq.,* for the petitioner.
*Edward C. Adams, Esq.,* for the respondent.

OPINION.

MURDOCK, *Judge:* A surtax on undistributed profits is imposed under section 14 of the Revenue Act of 1936. Certain credits are allowed, including one for dividends paid. See section 27. The latter section provides that the dividends paid credit in general shall be the amount of dividends paid during the taxable year. Subsection (d) is as follows:

(d) DIVIDENDS IN OBLIGATIONS OF THE CORPORATION.—If a dividend is paid in obligations of the corporation, the amount of the dividends paid credit with respect thereto shall be the face value of the obligations, or their fair market value at the time of the payment, whichever is the lower. If the fair market value is lower than the face value, then when the obligation is redeemed by the corporation, the excess of the amount for which redeemed over the fair market value at the time of the dividend payment (to the extent not allowable as a deduction in computing net income for any taxable year) shall be treated as a dividend paid in the taxable year in which the redemption occurs.

The Commissioner, in disallowing the credit, must have concluded that the notes had no fair market value, since that alone would explain his allowance of a credit to the extent of the small amount of cash paid. He did not suggest that the dividend was preferential. The determination of the Commissioner that the notes had no fair market value is presumed to be correct until proven otherwise. The first issue then is one of fact—what was the fair market value of the notes at the time they were distributed? We have concluded from all of the evidence that there is a clear preponderance in favor of the petitioner, and a finding has been made that the fair market value of the notes at the time they were distributed was equal to their full face value.

That finding completely disposes of the case, because the argument of counsel for the Commissioner that the dividend was preferential within the meaning of (g) is made only if we hold that the fair market value of the notes was less than their face value. Cf. I. T. 4514, C. B. XV–2, p. 90. His whole argument as made falls with the finding that the notes had a fair market value equal to their face value.

Reviewed by the Court.

*Decision will be entered under Rule 50*

LEECH, MELLOTT, TYSON, DISNEY, and KERN, *J. J.*, dissent.

---

TURNER, *J.*, dissenting: The question here is the amount of dividends paid credit, if any, to which petitiner is entitled under section 27 of the Revenue Act of 1936 in determining its adjusted net income nuder section 14 of the act. A dividend was paid partely in cash and

partly in notes and under section 27 (d), the petitioner is entitled to a dividends paid credit to the extent of the fair market value of the notes plus the amount of the cash, except and unless the dividend so paid was a preferential dividend under section 27 (g),[1] by reason of the fact that the notes had a value less than face and the stockholders receiving cash were thereby preferred over the stockholders receiving notes, in which event no dividends paid credit in any amount would be allowable. By finding that the notes had a fair market value at the date of issue equal to face, the Court has obviated the necessity for deciding the applicability of section 27 (g). The finding that the fair market value of the notes was equal to face is, in my opinion, however, wholly contrary to the evidence of record, which, when considered and weighed, leaves as the basis for such conclusion of value only the opinion testimony of interested witnesses, not seen nor heard by any of the Judges deciding the case.

At the time the notes were issued the capital of the petitioner, as shown by its own exhibits and admissions, was substantially impaired and under the law of Indiana a corporation in such circumstances not only had no power to declare and pay a dividend, but the statute contained a direct prohibition against such distribution. Burns Indiana Statutes, Ann., 1933, vol. 6, p. 27, par. 25–211. In addition to the prohibition against the corporation, the statute specifically imposed liability upon the directors of the corporation in the event of a knowing and willful declaration or assent to the payment of a dividend under the above circumstances. Burns Indiana Statutes, Ann., 1933, vol. 6, p. 55, par. 25–251. For the fiscal year ended June 30, 1931, and for a period of several years prior thereto, the net income of the petitioner was such as to indicate the existence of surplus earnings from which a dividend might have been paid. The evidence shows, however, that as early as June 30, 1932, the petitioner not only had no surplus of any kind, but a deficit of $40,851.50, and that the smallest deficit at the close of any subsequent year was $98,541.01 at the close of the taxable year. The dividends shown to have been paid do not wholly account for the use or dissipation of the early earnings, but the deficit may have resulted, to some extent, from the application of earnings in payment for common stock for employees, of which the employees acquired some seventy-odd percent. In any event, the fact that the petitioner was a deficit corporation with its capital impaired and not only recognized its status as such but knew that the payment of a dividend in such circumstances was in violation of Indiana law,

---

[1] SEC. 27. CORPORATION CREDIT FOR DIVIDENDS PAID.

\* \* \* \* \* \* \*

(g) PREFERENTIAL DIVIDENDS.—No dividends paid credit shall be allowed with respect to any distribution unless the distribution is pro rata, equal in amount, and with no preference to any share of stock as compared with other shares of the same class.

appears from the testimony of petitioner's president and otherwise in the record.

Thus we have a corporation which had earnings of approximately $50,000 during the taxable year and by reason thereof was faced with a substantial undistributed profits tax unless distribution should be made or a credit therefor otherwise obtained. There were two deterrents to the payment of a dividend by petitioner. First, it did not have the funds with which to pay a dividend and had to have the very small amount of cash which it did have for current operations, and, second, the profits for the year having been more than absorbed by losses amounting to some $118,000 net for the five years immediately preceding, it had no surplus from which it might pay a dividend, and for that reason was prohibited by state law from paying a dividend. In this dilemma, the petitioner proceeded with the issuance of the notes.

The notes were not in the form commonly used to establish an ordinary note indebtedness, but on their face severely limited the rights of the holders. The recipients and all subsequent holders were put on notice that any and all rights which they might have were "subject, junior and subordinate, to the rights and remedies of all creditors of said Company from time to time existing so long" as the said notes should remain outstanding, and, further, that they would not be entitled to participate in the assets of the company or the proceeds of any sale or disposition thereof until all creditors, common or otherwise, whether they became creditors before or after the issuance of the notes, should have their obligations "paid in full." The notes also contained specific prohibition against the institution of receivership, bankruptcy, liquidation. or dissolution proceedings in the event of default in the payment of principal or interest. In addition, they carried a provision that no recourse should be had against the officers or directors for the payment of principal or interest. That this latter provision was inserted in the notes for the specific purpose of avoiding the liability provided by the Indiana statute for the willful declaration or assent to the payment of a dividend, under the circumstances here, was acknowledged by petitioner's counsel in his opening statement.

With such restrictions and limitations blanketing the notes and serving as red flags of warning to any willing buyer desiring to buy notes but not required to buy, the only reasonable conclusion, in my opinion, is that no such buyer would have paid an amount even approaching face for the said notes, if, in fact, he would have considered buying them at any price. Then, too, the normal safeguards usually placed in notes or evidences of indebtedness for the protection of the holders thereof are noticeably absent. They do not contain, for instance, the common provision accelerating maturity in the event of default in the payment of interest, but, as above noted, the payment

of-both principal and interest is made secondary to the payment of all other creditors, common or otherwise, whether they became creditors before or after the issuance of the notes. It may be that a noteholder could have brought and maintained a suit to collect in the event of default at maturity and that the corporation, having issued the notes, could not have set up the defense of illegality, but certainly it would seem that the holders of the common stock, out of whose interest in the corporation the notes would have to be paid, could have required their cancellation and could have defeated their payment. In any event, the cloud of illegality hung over the notes from the date of their issuance and the fair market value, if any, was necessarily and substantially depressed thereby.

As showing that the notes had a value equal to face at the time of issuance, petitioner relies on the sale of two of the notes at face and 13.05 shares of preferred stock at par, and on the opinion testimony of certain of its officers and stockholders, each such person being the owner of some of the notes. The notes sold were quite small, one being $228.92 in amount and the other $72.60. The purchaser of the notes and 12.05 shares of preferred stock was petitioner's president, and the seller of the larger note and the said shares was his sister-in-law, who was in need of money, while the seller of the smaller note was his son's sister-in-law. No other notes were bought or sold by anyone for any price. The other single share of preferred stock was bought from petitioner by the president's secretary and was paid for by the application of a bonus received in connection with her employment. Opinion testimony at its best is probably the least desirable of all forms of evidence, and in this instance the opinions expressed were not the opinions of disinterested witnesses. After hearing those witnesses testify and noting their demeanor on the stand, it is my opinion that no one who saw them and heard their testimony could have failed to reach the conclusion that sentiment and personal interest were the important factors in the formation of the opinions expressed. In the case of the president of the corporation, the corporation and its affairs were a fetish with him, particularly because of the employee participation in ownership and management which he had instituted, and it is doubtful that he could have seen any weakness in anything even remotely connected with the corporation. Praiseworthy and commendable though they may be, sentiment and emotion are not trustworthy factors in the formation of opinion as to fair market value. As for the two women witnesses, no proper impression can be had from the reading of their testimony alone. The two men other than the president of the company were plainly of limited experience and were unimpressive in their testimony. Probably the major reason advanced by petitioner's president and vice president for the acceptance of their opinions as to the fair market value of the

notes was their knowledge of and experience in the canning business and in petitioner. In explanation of their reason for believing the notes would be paid and were therefore equal to face in value, they testified that the canning business ran in cycles and they felt that the canning business in general and the petitioner with it were entering a prosperous cycle. That such was the case, they thought, was indicated by the fact that, while during the five years just preceding the company had sustained a substantial net loss, it had during the taxable year earned approximately $50,000. The experiences which followed, however, do not corroborate but to the contrary discredit their judgment, in that the company sustained net losses of $14,311.36, $32,070.62, $39,585.91, and $7,145.80 for the four years succeeding, and it was not until the fiscal year 1942 that it again had a profit. By June 30, 1941, the deficit or impairment of capital had grown to $210,521.27 and the notes maturing in 1940 and 1941 were not paid when due but had to await the profits in 1942 for payment. In the light of the facts shown and admitted of record, and previously noted, the impotence of the above sales and opinions as evidence establishing the fair market value of the notes at face is, in my opinion, so obvious that further comment thereon would be wholly redundant.

In direct contrast with the above witnesses was the witness called by the respondent to give opinion testimony on the value of the notes. He was a man of wide experience in the securities field and had sold, dealt in, and valued securities for a great many years. He had no interest in the petitioner and his views were impersonal and were objectively formed and expressed. He was convincing and impressive in his testimony. It was his opinion that the notes of the petitioner issued under the circumstances herein and containing the restrictions and limitations appearing in these notes had no fair market value and could not have been sold to anyone, except and unless the prospective purchaser had some interest in the petitioner in addition to and beyond the notes themselves.

No one will say that the petitioner was not in a hard position in 1937 with respect to the tax on undistributed profits, but in that situation it was no different from hundreds of other deficit corporations. It may be that a way to the solution of this taxpayer's difficulty has been opened by section 501 of the Revenue Act of 1942 and, if so, it possibly may still move in that direction. On the issue here, however, the petitioner in no event is entitled to a dividends paid credit beyond the cash plus the fair market value of the notes, and we should not be enticed into finding a fair market value for the notes in excess of that justified by the evidence, even though a finding of value less than face might require the conclusion that the dividend paid was preferential, under section 27 (g), *supra*, and that no dividends paid

credit in any amount was therefore allowable. The power to legislate being in Congress, not in us, we may not by striving relieve a taxpayer of a tax burden which Congress has seen fit to impose. *Helvering* v. *Strong Manufacturing Co.*, 317 U. S. 102, and *Helvering* v. *Northwest Steel Rolling Mills, Inc.*, 311 U. S. 46.