## HUGHES TOOL CO. v. COMMISSIONER OF INTERNAL REVENUE (two cases).

### Nos. 11102, 11103.

Circuit Court of Appeals, Fifth Circuit.

March 9, 1945.

HOLMES, Circuit Judge, dissenting.

———◆———

---

[18] Quintana Petroleum Co. v. Commissioner of Internal Revenue, 5 Cir., 143 F.2d 588, 591.

968

J. L. Lockett, of Houston, Tex., for petitioner.

Warren F. Wattles, Sewall Key, Helen R. Carloss, and Morton K. Rothschild, Sp. Assts. to Atty. Gen., Samuel O. Clark, Jr., Asst. Atty. Gen., and J. P. Wenchel, Chief Counsel, Bureau of Internal Revenue, and John M. Morawski, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., for respondent.

Before SIBLEY, HOLMES, and WALLER, Circuit Judges.

SIBLEY, Circuit Judge.

In this consolidated case, taxes for 1936 and 1937 are involved, and the dispute is over the disallowance in computing the surtax on undistributed profits of a credit claimed under Revenue Act of 1936, Sec. 26(c) (1), 26 U.S.C.A. Int.Rev.Acts, page 836, by reason of a contract restricting the payment of dividends and requiring earnings to be set apart to pay a debt. There was such a contract executed by a wholly owned subsidiary, which was dissolved and its business taken over by the taxpayer during 1936, and the precise question is whether advantage can be taken by the taxpayer of the contract as to income arising solely from the subsidiary's business after its transfer.

Several wholly owned corporations were dissolved in 1936, but the facts need be stated only as to the taxpayer and two of them, Hughes Tool Corporation of Delaware, and Hughes Tool Company of Texas. The last named was first organized under the laws of Texas in 1913. It was the owner of the assets which produced the income here in controversy. The taxpayer was incorporated in Delaware in 1929, its original name being Hughes Industries Company, Ltd. In 1931 Hughes Tool Corporation was incorporated in Delaware wholly owned by the taxpayer. It acquired all the stock of the Texas corporation. Thus in 1935, the taxpayer owned Hughes Tool Corporation of Delaware, which in turn owned Hughes Tool Company of Texas, which was doing a large and active business. On October 1, 1935, the Texas company borrowed from banks $1,000,000, payable $100,000 each quarter, the last notes falling due July 1, 1938. The notes executed by the company contained a covenant expressly as part of the consideration of the loan that "the company will not pay nor advance to its stockholders as dividends or otherwise * * * more than one-half of its net earnings before depreciation per quarter, over and above the sum of $100,-000 per quarter, which said sum of $100,-000 shall be set apart for the purpose of liquidating serially the notes of this series as they shall severally mature". This covenant was kept both before and after the company's liquidation, which occurred July 31, 1936.

To accomplish the liquidation, on July 29 the directors of Hughes Tool Corporation, which owned all the stock of Hughes Tool Company of Texas, resolved that the latter ought to be completely liquidated, and that the former should transfer all the capital stock of the latter to it, in return for a transfer of "all the property, business, good will and net assets of the Hughes Tool Company", and that the "corporation accept said transfer, including the contracts of Hughes Tool Company and employ all the employees of Hughes Tool Company, and that Hughes Tool Corporation operate and conduct the business heretofore conducted by Hughes Tool Company". On the same day the stockholders of Hughes Tool Corporation approved this action of their directors and authorized the acquisition of the assets for the consideration expressed and "that the Corporation assume said contracts and operate said business". On July 30, the stockholders of Hughes Tool Company authorized acceptance of the offer of Hughes Tool Corporation to surrender all the former's capital stock "in consideration of distribution to Hughes Tool Corporation of all assets of this company; and the president and vice-president are directed to execute necessary and proper conveyances and assignments, subject to debts chargeable against the same." It was resolved, too, that Hughes Tool Company go into voluntary liquidation and that proper papers be filed with the Secretary of State of Texas to effect a voluntary dissolution and surrender of the charter. This was all promptly done, so that Hughes Tool Corporation as sole stockholder succeeded to the business of the Texas company intact on a voluntary liquidation and surrender of its charter. It then changed its name to Hughes Tool Company of Delaware.

On September 28, 1936, precisely the same offer was made by the stockholders and directors of taxpayer to exchange all the capital stock of the Hughes Tool Company of Delaware for "all the property, business, goodwill and assets" of that corporation,

subject to the contracts of said Hughes Tool Company and the employment of all its employees, the taxpayer "to assume full responsibility for the operation and conduct by this corporation of the business heretofore conducted and operated by said Hughes Tool Company. The assumption of such contracts and all of Hughes Tool Company's liabilities are hereby authorized and directed". This offer was accepted by the stockholders of the offeree, and the president and vice-president directed to make necessary and proper conveyances of the assets "subject to the debts, undertakings, and liabilities chargeable against the same". Voluntary liquidation and dissolution was voted with proper papers to be filed with the Secretary of State of Delaware to effect a surrender of the charter. This was all promptly done. The taxpayer then in turn took the name of Hughes Tool Company.

The officers of all three corporations were the same persons. The business of the original Texas company in the hands of each successor was carried on without change, and separate accounts and records were kept of it. The taxpayer, since it came to own the assets about Oct. 1, 1936, realized large income from them, after setting aside and paying over quarterly the sums necessary to meet the $600,000 of the bank loans then outstanding. There were some losses in other departments of its business which were taken as deductions in the tax returns for the year 1936 and the year 1937. Its net income was in a large amount undistributed, in respect of which the surtaxes in dispute were assessed. As a credit against the undistributed profits taxpayer claims not only the $100,000 per quarter set apart and paid to the banks, but also one-half of the overplus of net earnings which it contends it could not distribute without violating the contract with the banks.

The Tax Court held that the credit provision in Sect. 26(c) is to be strictly construed; that the restrictive covenant made by the Texas company with the banks was not executed by the taxpayer; and that any adoption by the taxpayer of the covenant occurred after May 1, 1936, and was therefore not available. The cases of Helvering v. Metropolitan Edison Co., 306 U.S. 522, 59 S.Ct. 634, 83 L.Ed. 957, and General Gas and Elec. Co. v. Commissioner of Internal Revenue, 306 U.S. 530, 59 S.Ct. 638, 83 L.Ed. 964, were distinguished, and no credit was allowed.

We find in the provisions of the Revenue Act of 1936, 49 Stats. 1648, a broad policy to discourage by heavy multiple taxation both holding corporations and the non-distribution of corporate profits. The way is opened to get rid of the holding corporations in Section 112(b) (6), page 1679, 26 U. S.C.A. Int.Rev.Acts, page 856, by providing that no gain or loss shall be recognized on the receipt by a corporation of property distributed in complete liquidation of another corporation, after December 31, 1935. This provision was acted on by the Hughes Tool Corporation of Delaware, which held all the stock of Hughes Tool Company of Texas by taking in complete liquidation the property of the latter. It was again availed of by the taxpayer by taking in complete liquidation the property of Hughes Tool Corporation, all of whose stock it held. The ultimate corporate owner thus became the active corporation by eliminating the others, pursuant to the policy of the statute.

 The true owner in fact only took what was its own, but the technical title to the assets and the income arising from them was shifted twice in the process, though the business and even its records were continued unchanged. If the business had remained in the hands of the Texas company that corporation would have continued to be the taxpayer, and it would have been entitled to the credit here claimed. The policy of the statute is to force distribution of profits, but not when the distribution would require violation of a written contract executed by the corporation before May 1, 1936. It is not denied that the covenant with the banks would entitle the Texas company to the credit claimed. The whole contention is that the taxpayer, though it became the successor to the business in the effort to eliminate holding companies, is not entitled. We thus face the question whether the words in Section 26 (c), "a written contract executed by the corporation" mean only the taxpayer corporation, or may include a corporation whose property is all taken over in complete liquidation by the owning corporation, pursuant to Section 112(b) (6).[1]

 It is well settled that this credit is in the nature of a partial relief from a tax

---

[1] By Texas law the dissolved Texas corporation continued to exist for some purposes for three years, but we rest the decision on no narrow basis of local law.

and is to be strictly construed, and allowed only to one who is clearly within its terms. Helvering v. Northwest Steel Mills, 311 U.S. 46, 61 S.Ct. 109, 85 L.Ed. 29; Helvering v. Ohio Leather Co., 317 U.S. 102, 63 S.Ct. 103, 87 L.Ed. 113; Phebus Oil Co. v. Commissioner of Internal Revenue, 5 Cir., 134 F.2d 217. Many other cases so say, but none answer our question precisely. In Helvering v. Northwest Steel Mills, supra, there was no contract at all, but the interference with paying out profits was by a State law. In Helvering v. Ohio Leather Co., supra [317 U.S. 102, 63 S.Ct. 107], there was a contract, but it did not prevent paying dividends "within the taxable year". In Phebus Oil Co. v. Commissioner of Internal Revenue, supra, the contract was not made by any corporation, but by certain persons who owned the corporation. There was no question of the transfer of a business in complete liquidation. The same is true of Anglim v. Acme Brewing Co., 9 Cir., 143 F.2d 412. In Little John Coal Co. v. Smith, 7 Cir., 135 F.2d 666, the contract was "adopted" by a corporation which did not come into existence till after May 1, 1936; and there was no discussion of any liquidation.

Helvering v. Metropolitan Edison Co., 306 U.S. 522, 59 S.Ct. 634, 83 L.Ed. 957, relied on by the taxpayer, did not involve the statutory provision before us, but did deal with the passage of incipient tax credits where an owned corporation was taken over in complete liquidation by its corporate owner on surrender of its stock, and was dissolved. The tax credits were upheld, the court saying vividly the "corporate personality of the transferor is drowned in that of the transferee", and the result was characterized as a merger. It was said by way of contrast, 306 U.S. 527, 59 S.Ct. 637, 83 L.Ed. 957, "The rule is not applicable upon a mere sale by one corporation of all its assets to another which assumes the liabilities of the former". It must therefore have been the liquidation and transfer of assets for a cancellation of stock which supported the decision, and preserved the tax status of the business.

In the present case it is not certain whether the proposals for liquidation and transfer of assets resulted in "the assumption" of the obligations of the transferor, or only in transfers "subject to" the same, for both expressions are used. An assumption, though it be a written contract executed by this taxpayer, would count for nothing here, because made since May 1, 1936. But it is certain that all parties intended that the obligations of the transferors should be met, and indeed the law would require as much of every sole stockholder taking over all of a corporation's property. This taxpayer was bound to carry out the written contract executed by the Texas corporation which it had absorbed or "drowned". The federal statute did not intend in taxing holding companies out of existence by forcing such liquidations as occurred here, to penalize honest performance of written contracts about earnings and dividends made before May 1, 1936. That no gain or loss is to be recognized shows that the survivor is to be regarded as standing in the place of the liquidated corporation. The dissolved corporation here may rightly be considered for tax purposes as merged into the corporation which thus took over its business, and to be among the corporations meant by the language of Section 26(c). The rule of strict construction should never defeat the fair and evident aim of the legislation, or work a hardship the legislature did not intend. This contract restricting distribution of profits expired with the year 1937, so that all accumulated profits have long since been distributed in dividends according to the policy of the law. We therefore hold the judgments of the Tax Court are not according to law, and order that the same be reversed, and that the surtaxes in controversy be redetermined with such credits as the contract with the banks may require, as if the corporation which made it had continued undissolved.

Reversed.

HOLMES, Circuit Judge (dissenting).

The majority opinion seems to derive much comfort from some supposed kinship between the 1936 statute providing for tax-free liquidations, and the credit against undistributed profits taxes provided by Section 26(c) (1). Unfortunately, the only link between the two is that each grants a credit against or exemption from a levied tax, and as such must be strictly construed against the taxpayer claiming the benefits thereof.

The purpose of Congress in enacting the former statute was to eliminate corporate holding companies. As an inducement to achieve this result, it permitted liquidations complying with the prescribed procedure to escape the tax incidence that otherwise

would have attached. It did not provide, as an additional inducement, either expressly or by implication, that the surviving corporations should also receive special tax benefits conferred upon the extinguished corporation by Section 26(c) (1). It is strange reasoning to say that the Congress, by its action in conferring benefits, created an unreasonable hardship upon the recipient of its bounty because it did not give more.

Our problem here is simply to determine whether this taxpayer was, within the language of Section 26(c) (1), a corporation that could not pay out some of its adjusted net income as dividends "without violating a provision of a written contract *executed by the corporation* prior to May 1, 1936." The questions of time and of identity are crucial. Under the exact terms of the statute, the corporation claiming the credit must be the corporation that made the contract, and the contract must have been executed prior to May 1, 1936. Neither requisite is fulfilled in this case.

Under settled law, two corporations are regarded as separate taxing entities even though one owns the entire stock of the other. At all times prior to May 1, 1936, the Texas corporation that made the contract and the Delaware corporation that claims the credit were separate, subsisting corporate entities; and even if Delaware made a contract by assuming the obligations of Texas, such contract was entered into after May 1, 1936, too late to comply with the terms of the statute.

The effort to escape the force of these determinative facts by claiming that a merger took place such as preserved the identity of the Texas corporation in the taxpayer is likewise without avail. Except in some instances for purposes of suit, a corporation that is wholly liquidated and dissolved is no longer existent. What took place here was a voluntary dissolution of the subsidiaries after a distribution in complete liquidation. There was no merger,

consolidation, or amalgamation of any of these corporations. Moreover, even if there had been a statutory or de facto merger of the Texas corporation with the Delaware corporation, the identity of the merged corporation under the controlling laws of Delaware would either be that of the corporation surviving after the merger, or it would be a new corporation created by the consolidation of the two; in no event would it be the Texas corporation, which was the corporation that executed the contract.[1]

Further, there is a profound difference between taking over the assets of a corporation, and absorbing its identity or corporate life as a fictitious entity. The latter is generally spoken of in America as a consolidation, and must have legislative authority or consent.[2] Here a Texas corporation is said to have been drowned[3] in two Delaware corporations. No facts support the argument (because no merger or consolidation was attempted), and the law refutes it. No state or federal government undertook to grant to the Delaware corporation the additional status of a Texas corporation. There was no way to transfer the Texas legal entity to the Delaware corporation.

The case of Helvering v. Metropolitan Edison Co., 306 U.S. 522, 59 S.Ct. 634, 83 L.Ed. 957, has no application here. In that case the Taxpayer had deducted certain expenses and interest paid by it. Every one conceded that, if the items paid were obligations owed by the taxpayer and were not acquired by it by purchase, the deductions were proper. There was no question either of time or of identity. In this case the all important questions are whether the taxpayer claiming the credit executed the contract restricting dividends, and if so, whether that contract was made prior to May 1, 1936.

I think the decision of the Tax Court should be affirmed.

---

[1] Secs. 2091 and 2092 of the Revised Code of Delaware (1935).

[2] Thomas v. Railroad Co., 101 U.S. 71, 25 L.Ed. 950.

[3] The metaphor is an unfortunate one in this case. *Drown* means to perish or suffocate in water or other fluid; to choke to death or stifle in water; to extinguish. In this view the Texas Company has been drowned twice: first by being immersed in the Tool Corporation, and next by immersion in the corporate taxpayer.

A word like this leaves the lawyers in doubt as to its legal significance. Courts should use legal language in writing their opinions; then the profession would understand what they mean.