## COMMISSIONER OF INTERNAL REVENUE v. OSWEGO FALLS CORPORATION.

### No. 273.

Circuit Court of Appeals, Second Circuit.

June 29, 1943.

Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key, J. Louis Monarch, and Carlton Fox, Sp. Assts. to the Atty. Gen., for petitioner.

A. H. Cowie and Gerald H. Henley, both of Syracuse, N. Y., for respondent.

Before L. HAND, AUGUSTUS N. HAND, and FRANK, Circuit Judges.

FRANK, Circuit Judge.

The Commissioner contends that the taxpayer, without violation of the mortgage indenture, could have paid dividends in its unsecured notes (or other unsecured obligations) maturing more than "a year after their date." There may perhaps be some doubt whether such obligations, if maturing before the mortgage bonds, would have violated the provisions of the indenture; but that is a question we need not consider. For, if dividends had been paid in unsecured obligations maturing after July 1, 1941, when the mortgage bonds were payable, those unsecured obligations would not have violated the indenture provisions. The definition of "current liabilities," by specifying certain kinds of obligations, excluded others of a substantially dissimilar kind, according to the familiar rules of expressio unius and ejusdem generis. The obligations which were expressly included in the definition of "current liabilities" were, except "loans from banks or bankers," either those which matured within one year or which had "accrued" or were "overdue."

The purpose of the "net current assets" limitation on dividend payments was obviously to ensure that taxpayer would not be so burdened with net "quick" obligations before the mortgage bonds matured as to impair its business operations and thus court the danger of a default in the payment of the mortgage bonds. If taxpayer were unable to pay the mortgage bonds when due, the existence of unsecured obligations shortly thereafter becoming due would not have the effect which the "current assets" limitation was designed to prevent. Had the bonds issued pursuant to the indenture been unsecured debentures, perhaps the interpretation of the "current assets" provision would have been affected by the fact that, on default and resultant liquidation of taxpayer, the distribution to the bonds would be reduced by the participation of the obligations issued in payment of dividends; but here the bonds are secured by the major part of the taxpayer's assets, and the bonds, on liquidation, would share with other creditors only in the unmortgaged assets.

We cannot ignore the fact that the indenture is a detailed instrument which covers 87 printed pages of the record and contains some 37,000 words—facts which serve to

show that those who represented the mortgage bankers in the drafting of that instrument were not overlooking any possibilities of protection for the bondholders. If they had intended to prevent the issuance, in payment of dividends, of unsecured obligations coming due after five or more years, it is impossible to believe they would have spared the few extra words needed to express that intention. If they had intended to negate the application of the usual rules of expressio unius and ejusdem generis to the clause defining "current liabilities," they would surely have done so by inserting, before the enumeration of the specifically described kinds of current liabilities, the phrase—found in the granting clause of the indenture quoted above—"including, but not in limitation of the foregoing, the following," or some equivalent phrase, examples of which appear in the form books.

Accordingly, "without violating a provision of a contract," the taxpayer could have paid dividends in its unsecured obligations maturing after July 1, 1941. Even if one were to question that conclusion as to such obligations maturing shortly after that date, it would be impossible to do so as to such obligations maturing several years thereafter, say in 1946. It follows that the taxpayer was not entitled to a credit under § 26.

It is suggested that such an interpretation of the statute is unfortunate since, thus interpreted, the legislation creates an incentive to indulge in undesirable corporate financial practices in order to obtain savings in taxes. Doubtless it does, as do other provisions of our revenue laws which deserve Congressional re-examination from that point of view.[5] But such policy considerations are not for the courts; it cannot be said too often that judicial legislation, while at times unavoidable and indeed desirable, must, so far as it affects statutes, be confined to filling in small gaps in legislative legislation in accordance with what appears to have been the legislative purpose.[6] Moreover, we cannot forget that the Supreme Court has admonished us that § 26 is to be strictly construed against taxpayers.[7]

Reversed.

[5] See, e. g., Taxation of Corporate Enterprise, Monograph No. 9 (1941) Temporary National Economic Committee, 76th Congress, 3d Sess., pp. 91–92, to the effect that federal tax laws discriminate undesirably in favor of debt financing.

[6] See discussion and cases and other authorities cited in Commissioner v. Beck's Estate, 2 Cir., 129 F.2d 243, 245, 246; Hoffman v. Palmer, 2 Cir., 129 F. 2d 976, 987, and note 21, affirmed February 1, 1943, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. ——.

[7] Helvering v. Northwest Steel Mills, 311 U.S. 46, 49, 61 S.Ct. 109, 85 L.Ed. 29; Helvering, Commissioner, v. Ohio Leather Co., November 9, 1942, 317 U. S. 102, 63 S.Ct. 103, 87 L.Ed. ——. See, also, Helvering v. Magnus Beck Brewing Co., Inc., 2 Cir., December 7, 1942, 132 F.2d 379; Buffalo Slag Co. v. Commissioner, 2 Cir., 131 F.2d 625, 626; Van Ameringen-Haebler, Inc., v. Helvering, 2 Cir., December 28, 1942, 132 F.2d 855.