## RAHR MALTING CO. v. UNITED STATES.
### Civ. No. 618.

District Court, E. D. Wisconsin.
Feb. 24, 1944.

of income tax and of surtax on undistributed profits for the years 1936 and 1937. The disputed sums were (a) $677.94 paid on December 15, 1937, and $73,408.77 paid on April 25, 1940, totaling $74,086.71 for the year 1936, and (b) $50,409.20 paid on April 25, 1940, for the year 1937, aggregating $124,495.91 for both years. The collector of internal revenue to whom the payments were made is now deceased. Claims for refund were timely filed, and this suit was commenced within two years after denial of said claims by the commissioner of internal revenue.

There are two issues to be determined: (a) Is the bank commitment agreement executed by plaintiff on January 17, 1936, and under which plaintiff borrowed money on May 15, 1936, a written contract restricting dividends, as specified in Sec. 26(c) (1) of the Revenue Act of 1936, 26 U.S.C.A., Int.Rev.Acts, page 836, so as to entitle plaintiff to credit in the computation of its undistributed profits surtax for 1936 and 1937? and (b) Is plaintiff's loss from embezzlement in 1936 in the sum of $15,641.48 a deductible loss for that year when not discovered until 1938?

Plaintiff, a Wisconsin corporation, kept its books for tax purposes and filed its income tax returns in 1936 and 1937 upon the calendar year basis. It reported no undistributed net income and no surtax due for these years. It was allowed credit for dividends amounting to $165,000 paid on November 23, 1936, and $411,984.38 paid on November 19, 1937. It also claimed credit in each of those two years for all its additional surtax net income, upon the ground that such funds could not be distributed as dividends without violating the restriction against dividend payments provided in a contract executed prior to May 1, 1936.

Miller, Mack & Fairchild, Frederic Sammond, Theodore C. Bolliger, and Marcus L. Plant, all of Milwaukee, Wis., and Nash & Nash, of Manitowoc, Wis., for plaintiff.

B. J. Husting, U.S. Atty., and E. J. Koelzer, Asst. U.S. Atty., both of Milwaukee, Wis., and Samuel O. Clark, Jr. Andrew D. Sharpe, and Frank J. Ready, Sp. Assts. to the Atty. Gen., for defendant.

DUFFY, District Judge.

This action under Sec. 24(20) of the Judicial Code, as amended, 28 U.S.C.A. § 41(20), is to recover alleged overpayments

The contract referred to by plaintiff was with the First National Bank of Chicago (hereinafter referred to as the "bank"), and was in the form of a commitment letter from the bank dated January 13, 1936, and accepted by plaintiff on January 17, 1936. It reads as follows:

"The First National Bank of Chicago
"Chicago, Illinois
"January 13, 1936
"Rahr Malting Company
"Manitowoc, Wisconsin
"Gentlemen:
"You have advised us of your intention to cause your wholly owned subsidiary,

Cepro, Inc., to acquire a building site at Shakopee, Minnesota, and to erect thereon a modern malt manufacturing plant at a cost of approximately $500,000, and of your desire to make a loan for that and other corporate purposes.

"Confirming oral conversations with you, we agree that in the period between the date hereof and May 15, 1936, we will, from time to time at your request, loan you sums not exceeding in the aggregate, $750,000, upon the following terms and conditions:

"(1) The loans so made by us shall be evidenced by your promissory notes in substantially the form of that attached hereto, with such variations as may be consistent with this letter, which shall be dated and delivered simultaneously with the making of such loans. The first $150,000 principal amount of notes so issued and delivered shall mature May 15, 1937, and a like principal amount shall mature May 15 of each subsequent year except that if the total amount loaned under this commitment is not an even multiple of $150,000, the last maturity shall be of the principal amount by which the total amount of the loan exceeds the highest multiple of $150,000 contained therein. Notes maturing May 15, 1937, and May 15, 1938, shall bear interest until maturity at the rate of 3% per annum; notes maturing May 15, 1939, and May 15, 1940, shall bear interest until maturity at the rate of 3-1/2% per annum; notes maturing May 15, 1941, shall bear interest until maturity at the rate of 4% per annum. Interest to maturity on all notes shall be payable on the first days of November, February, May and August in each year. All such notes shall bear interest after maturity at the rate of 6% per annum.

"(2) The first proceeds of the loans so made by us shall be applied to the payment of your two notes now held by us dated May 15, 1935, each of the principal amount of $125,000 and due two years after date and three years after date respectively at their principal amount, plus accrued interest.

"(3) You agree to cause the acquisition in fee of such building site by Cepro, Inc. and the erection of said malt manufacturing plant and the complete equipment thereof at a cost of not exceeding $825,000; that it will be constructed and equipped free and clear of liens or claims of contractors, mechanics, material men, or others; that the proceeds of the loans made under this commitment not applied in accordance with paragraph (2) hereof, shall be applied to the payment of the cost of construction and equipment of such plant or to reimburse you for expenditures made by you, or loans made by you to Cepro, Inc. for the purpose of such construction or equipment; that you will from time to time at our written request, furnish us with full information as to the status of such construction, with copies of plans and specifications of such plant and with estimates of cost by qualified architects or engineers.

"Your acceptance in writing of this offer in the space provided below shall constitute this an agreement between us.

"Very truly yours,
"The First National Bank of Chicago
"By (Signed) J. L. Buchanan
"Vice President

"Dated:
"January 17, 1936
"Accepted:
"Rahr Malting Company
"By (Signed) G. R. Rahr
"President"

The form of promissory notes incorporated as part of the commitment letter contained the following:

"The undersigned further covenants and agrees:

"(1) Not to pay any cash dividends upon or make any cash distribution with respect to any of its capital stock except from net earnings after August 1, 1935 * * * and not to make any such payment or distribution in excess of $55,000, if, immediately thereafter, such consolidated net current assets would be less than $1,500,000, and not to make any such payment or distribution exceeding in the aggregate in any one year the sum of $165,000 except as provided in paragraph (2) hereof.

"(2) That if in any fiscal year the net earnings of the undersigned available for dividends shall exceed $390,000, one-half of the excess shall be applied * * * to the retirement * * * of Notes * * *. The other one-half shall be applied to the corporate purposes of the undersigned. The undersigned may, at its option, apply such one-half of the excess earnings to the payment of cash dividends upon, or the making of cash distributions with respect to, any of its capital stock even though by virtue thereof the total of such payments in any one year shall exceed the amount of $165,000, mentioned in para-

graph (1) hereof, but shall have no right to make such application if immediately thereafter the consolidated net current assets of the company and Cepro, Inc. would be less than $1,500,000."

For the twelve months ending August 31, 1936, that is, the first fiscal year referred to in the second paragraph of the foregoing, plaintiff's net earnings were $533,-813.75. The bank consented to the distribution of a dividend totaling $165,000 in November, 1936, waiving the fact that the consolidated net current assets on August 31, 1936, were below the level of $1,500,000 required for such dividend. Plaintiff's net earnings for the following fiscal year were $819,306.05, and the bank again consented to a dividend distribution totaling $412,500 in November, 1937, once more waiving the restrictions relative to consolidated net earnings.

Immediately upon accepting the terms of the bank's commitment agreement, plaintiff caused its wholly-owned subsidiary, Cepro, Inc., to enter into contracts for the construction of a new plant. The principal construction contract was executed January 21, 1936, and was fully performed by July 15, 1936. Under it Cepro, Inc., was obligated to pay $682,190 in monthly installments according to the progress of the work.

The plaintiff did not utilize the credit provided by the bank's commitment letter until May 15, 1936. In the meantime, on March 14, 1936, it paid off its then existing indebtedness to the bank of $250,000, the notes for which contained certain dividend restriction covenants. During the spring of 1936 plaintiff also made substantial cash payments under the contract for the construction of the new Cepro plant. For these purposes it employed its own operating revenues and working capital. Thus, so far as the bank was concerned, the plaintiff was not indebted to it in any amount from March 14 to May 14, 1936, inclusive.

On May 15, 1936, plaintiff obtained a loan of $750,000 from the bank which was evidenced by five promissory notes of that date, maturing one by one annually thereafter over the ensuing five years, each in the amount of $150,000. In form these notes corresponded to the form of note accompanying and part of the bank's commitment agreement. Certain of these notes remained unpaid until after December 31, 1937.

During 1936 and 1937 plaintiff's capital stock consisted entirely of common shares. In addition to the payment of cash dividends in 1936 and 1937 as hereinbefore indicated, plaintiff paid a stock dividend on December 1, 1936, resulting in the exhaustion of its surplus and undistributed profits and an increase of its outstanding stock to $2,750,000.

The following provisions of Sec. 26(c) (1) of the Internal Revenue Act of 1936 are applicable:

"§ 26. Credits of Corporations.

"In the case of a corporation the following credits shall be allowed to the extent provided in the various sections imposing tax—

$$* \qquad * \qquad * \qquad * \qquad *$$

"(c) Contracts Restricting Payment of Dividends.

"(1) Prohibition on payment of dividends. An amount equal to the excess of the adjusted net income over the aggregate of the amounts which can be distributed within the taxable year as dividends without violating a provision of a written contract executed by the corporation prior to May 1, 1936, which provision expressly deals with the payment of dividends. * * *"

It is well established that a taxpayer claiming a deduction from or credit against his income for the purpose of reducing his tax liability has the burden of establishing clearly that he comes within the provisions of the statute. New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440, 54 S.Ct. 788, 78 L.Ed. 1348; White v. United States, 305 U.S. 281, 59 S.Ct. 179, 83 L.Ed. 172; Deputy v. DuPont, 308 U.S. 488, 493, 60 S.Ct. 363, 84 L.Ed. 416; Helvering v. Northwest Steel Rolling Mills, Inc., 311 U.S. 46, 49, 61 S.Ct. 109, 85 L.Ed. 29; Helvering v. Ohio Leather Co., 317 U.S. 102, 63 S.Ct. 103, 87 L.Ed. 113.

Plaintiff argues that the commitment letter is in fact and under Wisconsin law a binding contract executed prior to May 1, 1936, and therefore within the provisions of Sec. 26(c) (1). It points out that the purpose of the surtax on undistributed profits was to compel the distribution of earnings by corporations, and that as a deterrent to their retention the surtax imposed on undistributed profits was very substantial. But plaintiff also stresses that the Congress recognized some corporations would be prevented by contract from

making such distributions, and that they would be unfairly discriminated against if required to pay a tax for not doing what they were lawfully unable to do, and that to cover such situations and also to prevent contracts restricting dividends from being made in contemplation of the passage of the proposed law, Congress specified that any such agreement must be a written contract executed by the corporation prior to May 1, 1936. Plaintiff contends that it comes entirely within the provisions of Sec. 26(c) (1).

■ The arrangements for the new construction and for the new financing were made by plaintiff in good faith, and without having in mind the proposed excess profits tax. If plaintiff had not paid its old debt of $250,000 to the bank before May 1, a written contract restricting the payment of dividends would have been in effect. Or, having paid the old debt, if plaintiff had borrowed the new sum of $750,000 from the bank before May 1, pursuant to the January letter of commitment, and had executed the notes on the forms prescribed in that contract, a written contract restricting the payment of dividends would have brought plaintiff within the terms of Sec. 26(c) (1).

However, on the critical date of May 1, 1936, no written contract which in any way restricted the plaintiff from paying dividends was effective. The bank's commitment letter accepted by the plaintiff in itself contained no prohibition or restriction of payment of dividends. Its terms merely provided that if and when the bank loaned the sums agreed to, the restrictions mentioned in the form of note attached to said commitment letter would be included as provisions of the executed promissory notes. But not until any notes were executed was the plaintiff's right to declare and pay dividends restricted or prevented in any way.

The plaintiff has not established that it comes within the provisions of Sec. 26(c) (1) and is, therefore, not entitled to the credit requested. Bethlehem Silk Co. v. Commissioner of Internal Revenue, 3 Cir., 124 F.2d 649; Central West Coal Co. v. Commissioner of Internal Revenue, 7 Cir., 132 F.2d 190; Florence Cotton Mills v. Commissioner of Internal Revenue, 5 Cir., 126 F.2d 1017; Atlantic Co. v. Commissioner of Internal Revenue, 5 Cir., 129 F.2d 87.

■ Even though the notes of May 15, 1936, had been effective prior to the critical date of May 1, 1936, there is respectable authority for the proposition that, since only cash dividends were subject to restriction in the notes, plaintiff would have no basis for the credits claimed under the statute which requires all dividends to be restricted in order to claim credit thereunder. Valentine-Clark Corp. v. Commissioner of Internal Revenue, 8 Cir., 1943, 137 F.2d 481; Commissioner of Internal Revenue v. Oswego Falls Corp., 2 Cir., 1943, 137 F.2d 173.

■ Considering now the second issue as to whether the loss by embezzlement is a deductible loss, the facts are without dispute. In 1934, Schultz Brewing Company of Union City, New Jersey, was indebted to plaintiff in the amount of $20,278.17. This obligation was guaranteed by Frank Schultz who owned an interest in the brewing company. In order to acquire security, plaintiff entered into an agreement with Schultz on October 17, 1934, and, pursuant thereto, expended $9,603.50 to obtain clear title to Asbury Park Bonds which belonged to Schultz. Under the agreement these bonds were available for sale by the plaintiff, the proceeds to be applied against its claim against the brewing company, and Schultz's obligation as guarantor would then be discharged. Plaintiff's agent, a New Jersey attorney, acquired possession of the bonds, and wrongfully sold them on April 22, 1936, receiving therefor the then current market value of $15,750, and appropriated the proceeds for his own use. Plaintiff did not discover the embezzlement until March, 1938. In June, 1938, the attorney became bankrupt and plaintiff filed a claim in bankruptcy, but received as dividends only $108.52. The attorney was sent to prison for his embezzlement. Plaintiff did not deduct any loss for the calendar year 1936 on account of said embezzlement, because it was unknown to plaintiff when it filed such return. Plaintiff was never compensated for the loss by insurance or otherwise.

The brewing company was liquidated in 1939 in bankruptcy proceedings, and no dividend was paid to creditors. Plaintiff made claim for deductions of portions of the account against the brewing company as a bad debt in both 1934 and 1936, but such deductions were disallowed by the commissioner due to the existence of the collateral hereinbefore described. For the income tax period which ended August 31, 1939, plaintiff was allowed a deduction of $3,005.27 as a bad debt, this amount

being the remainder of the account against the brewing company not previously claimed as a deduction by the plaintiff.

Losses from embezzlement are allowable as a deduction under Sec. 23(f) of the Revenue Act of 1936, 26 U.S.C.A. Int.Rev. Acts, page 828, which permits corporations to deduct losses. The Circuit Court of Appeals for the Seventh Circuit in a recent case (Messenger Corp. v. Smith, 136 F.2d 172) held that the deductibility of a loss from default or defalcation of another person is not affected by the fact that the transaction out of which it arose would not otherwise have given rise to a deduction.

It is my opinion that the plaintiff is entitled to a deduction of $15,641.48 for the year 1936. Under the agreement between the plaintiff and the brewing company, the plaintiff had the right to sell the bonds and apply the resulting proceeds on the debt.

The sale having been made, the proceeds belonged to the plaintiff and to no-one else. It is immaterial that the sale was wrongful as between the plaintiff and its attorney. It was the plaintiff's funds which were embezzled.

Findings and judgment may be presented for the recovery by plaintiff of such sum as it may be entitled to recover by law, giving effect to the deduction of $15,641.48 in its 1936 tax return, plus interest.